276 P.3d 11

CAL X–TRA, a California corporation; Cattletrack 10K, L.L.C., an Arizona limited liability company; Leo R. Beus; Alan Mishkin; Trst, L.L.C., a Delaware limited liability company; Trst II, L.L.C., an Arizona limited liability company; and McWin, L.L.C., an Arizona limited liability company, derivatively on behalf of and for the benefit of 10K, L.L.C., an Arizona limited liability company, Plaintiffs/Appellants/Cross–Appellees,

v.

W.V.S.V. HOLDINGS, L.L.C., an Arizona limited liability company; Conley Wolfswinkel, Defendants/Appellees/Cross–Appellants.

Cal X–Tra, a California corporation; Cattletrack 10K, L.L.C., an Arizona limited liability company; Leo R. Beus; Alan Mishkin; Trst, L.L.C., a Delaware limited liability company; Trst II, L.L.C., an Arizona limited liability company; and McWin, L.L.C., an Arizona limited liability company, derivatively on behalf of and for the benefit of 10K, L.L.C., an Arizona limited liability company, Plaintiffs/Appellees,

v.

W.V.S.V. Holdings, L.L.C., an Arizona limited liability company, Defendant/Appellant.

Nos. 1 CA–CV 08–0567, 1 CA–CV 09–0445.

Court of Appeals of Arizona, Division 1, Department D.

April 24, 2012.

Cohen Kennedy Dowd & Quigley, P.C., By Ronald Jay Cohen, Daniel G. Dowd, Laura H. Kennedy, Rebecca L. Van Doren, Phoenix, Attorneys for Plaintiffs/Appellants/Cross–Appellees And Plaintiffs/Appellees.

Wright & Associates, By Lawrence C. Wright, Mesa, And Lee Allen Johnson, P.C., By Lee Allen Johnson, Tempe, Attorneys for Defendants/Appellees/Cross–Appellants And Defendant/Appellant.

## OPINION

WINTHROP, Presiding Judge.

¶ 1 In this consolidated appeal and cross-appeal, we address questions about the conclusiveness of our previous appellate ruling in subsequent proceedings between the same parties. Concluding that this case presents one of those rare exceptions for which Rule 60(c), Ariz. R. Civ. P., is designed, we agree

with the trial court that previous judgments obtained by extrinsic fraud cannot stand. We therefore affirm the trial court's judgment vacating judgments entered in 2003 as the product of extrinsic fraud. We further conclude as a matter of first impression, however, that the trial court erred in awarding attorneys' fees pursuant to Arizona Revised Statutes ("A.R.S.") section 29–833(A) (West 2012).[1] We also conclude that, after a separate but factually related trial, the trial court did not abuse its discretion in setting aside the verdict and ordering a new trial or in declining to impose sanctions against the plaintiff. Accordingly, we affirm the trial court's judgments except for the award of attorneys' fees, and we remand for a new hearing consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

### I. 10K's Formation & The Real Estate Transactions

¶ 2 In 1995, Robert Burns, a real estate developer in the Phoenix area, proposed a deal to acquire land in western Maricopa County to a group of investors, including Paul Gilbert, Leo Beus, and some limited liability companies. By June 1995, the investors had formed an entity known as 10K, L.L.C. ("10K") for the purpose of acquiring, developing, and selling 10,016 acres ("the 10K Property") in the area of Buckeye, Arizona.

¶ 3 A series of transactions culminated in 10K's purchase of the 10K Property for approximately $9,200,000. The 10K investors paid approximately $1,850,000 in cash and financed the remainder through a promissory note ultimately assigned to Citicorp U.S.A., Inc. ("Citicorp"). The debt was to be serviced through periodic capital calls on the investors.

¶ 4 An operating agreement for the project was put in place, and Phoenix Holdings II, L.L.C. ("Phoenix Holdings"), an entity controlled by Burns and Brent Hickey,[2] was hired as the exclusive manager of 10K's busi-

---

1. Throughout this opinion, we cite the most current version of each statute as it appears on Westlaw unless the statute has changes material to our analysis.

2. In this opinion, the term "the Phoenix Holdings defendants" refers to Phoenix Holdings, Burns, and Hickey collectively.

ness and affairs. Although Phoenix Holdings was not a member of and did not invest money in 10K, the operating agreement vested almost exclusive control in Phoenix Holdings to direct, manage, and control the 10K Property, except that Phoenix Holdings was required to obtain the approval of two-thirds of the 10K members before selling or transferring all or substantially all of the assets of 10K. In return for management services, Phoenix Holdings was to receive an annual fee of $10,000, reimbursement of project-related expenses, and subordinated profit participation on the sale of the project.

¶ 5 Phoenix Holdings later proposed that 10K purchase an additional 3,244 acres of adjacent land ("the Spurlock Property"), which was owned by Spurlock Land, L.L.C. ("Spurlock"). Burns found a buyer for the combined parcel of 13,260 acres (collectively, "the Sun Valley Property") in an entity known as Breycliffe, L.L.C. ("Breycliffe"), a Nevada limited liability company. In November 1998, Spurlock, 10K, and Breycliffe agreed to a series of transactions: In contemporaneously signed purchase agreements, which referenced and were contingent on one another, Spurlock agreed to sell the Spurlock Property to 10K ("the 1998 Spurlock Agreement"), and 10K agreed to sell the Sun Valley Property to Breycliffe ("the 1998 Breycliffe Agreement"). The agreements were to close escrow simultaneously. From these transactions, 10K stood to receive $5, 000 per acre (paid with no interest over as much as twenty years) plus a twenty percent profit participation in the Sun Valley Property once the acreage was developed and sold.[3] Under the 1998 Breycliffe Agreement, Breycliffe was required to satisfy certain conditions ("the Approvals Condition") before closing. Over the next several years, however, Breycliffe did not or was unable to satisfy the conditions; accordingly, the transactions did not close as originally set forth in the agreements.

## II. The 2002 Litigation

¶ 6 After November 1998, the 1998 Spurlock and Breycliffe Agreements were amended several times and close of escrow was repeatedly delayed as the closing dates were extended, eventually to March 2002.[4] By then, however, disputes had arisen among the parties regarding the timely fulfillment of Breycliffe's and 10K's obligations and whether Spurlock was required to nonetheless allow 10K (and thus Breycliffe) to close despite the fact that the Approvals Condition had still not been met. 10K requested that Spurlock grant an extension of the "Approvals Condition Period," but after Spurlock declined to grant the extension, 10K accused Spurlock of anticipatorily repudiating and breaching the 1998 Spurlock Agreement and announced it intended to close on the transactions.

¶ 7 The disputes led to litigation among Spurlock, 10K, and Breycliffe. In February 2002, 10K sought specific performance and declaratory relief against Spurlock in superior court cause no. CV 2002–002933. In March 2002, Spurlock sought declaratory relief against 10K and Breycliffe in superior court cause no. CV 2002–004470. The cases were consolidated under cause no. CV 2002–002933 ("the 2002 litigation").

¶ 8 Settlement negotiations ensued, and on June 4, 2002, the 2002 litigation was settled with the parties entering amended and restated contracts between Spurlock and 10K ("the 2002 Spurlock Agreement"), and between 10K and Breycliffe ("the 2002 Breycliffe Agreement"). The amended agreements extended the date for close of escrow up to September 16, 2003. Pending closing, Breycliffe, as the ultimate buyer, was required to make quarterly and monthly pay-

---

3. Although the purchase of the Spurlock Property was to cost 10K approximately $16,220,000 on paper, no actual cash was to be paid by the 10K investors because the 1998 Breycliffe Agreement was supposed to close simultaneously. Further, although the payout to 10K was not actually required for twenty years, it could be sooner if the project was developed and sold. The major advantages to the 10K investors from these agreements, apart from the extraordinary profit they would eventually make, was that the 10K members would be free from the financial obligations of servicing the Citicorp and Spurlock debt, and someone else would front the development costs.

4. The 10K investors continued to service the Citicorp debt through capital calls.

ments on behalf of 10K to service the debt that encumbered the Spurlock Property. Notwithstanding the rapidly rising real estate market at the time, the purchase price of the Sun Valley Property ($66,300,000) did not change.

¶ 9 Also on June 4, as part of the settlement and on stipulation of the parties, the revised agreements were incorporated into a Final Judgment and Permanent Injunction Order entered by Judge J. Kenneth Mangum ("the 2002 Mangum Judgment"). The 2002 Mangum Judgment enjoined Spurlock, 10K, and Breycliffe to perform the amended contracts.

¶ 10 Breycliffe's interest in the 2002 Breycliffe Agreement was assignable, and Phoenix Holdings, on behalf of Breycliffe, had been secretly marketing that interest to third parties, while at the same time soliciting substantial profit participation for Phoenix Holdings in any such agreement. When some of the 10K investors learned of this activity, they instructed Burns to cease it. The investors also learned that Burns and Phoenix Holdings were about to offer Breycliffe's acquisition interest in the Sun Valley Property to Conley Wolfswinkel, a businessman and real estate investor who had federal convictions for bank fraud, conspiracy to commit bank fraud and misapplication of bank funds, and aiding and abetting misapplication of bank funds, *see United States v. Wolfswinkel*, 44 F.3d 782, 783–84 (9th Cir. 1995), and two civil judgments in excess of one billion dollars each entered against him related to fraudulent business activities. These convictions and judgments related to and/or resulted from Wolfswinkel's role in the savings and loan crisis that occurred after the collapse of the real estate market in the late 1980s.

¶ 11 On June 21, 2002, 10K investors met with Burns and instructed him not to offer the Breycliffe interest to Wolfswinkel and to instead negotiate for 10K's reacquisition of that interest. While Burns met with the 10K investors, however, Hickey met with Wolfswinkel and offered him the opportunity to purchase Breycliffe's right to acquire the Sun Valley Property. At the conclusion of the meeting with Hickey, Wolfswinkel agreed to the deal, an opportunity later described by Wolfswinkel's son, Brandon, as "unbelievable." [5] Hickey and Burns met with Wolfswinkel later that day to discuss details of the agreement; at the meeting, Burns advised Wolfswinkel that the 10K members were upset and adamant that the deal not go forward.

¶ 12 Nevertheless, Wolfswinkel committed to the deal, and on June 25, 2002, Hickey drafted a Letter of Intent, which included a confidentiality clause prohibiting any disclosure of the agreement assigning Breycliffe's position. By agreeing to the deal, Wolfswinkel committed to pay Breycliffe $7,850,000 for the contract position, and he immediately put $500,000 in escrow.

¶ 13 Thus, shortly after entry of the 2002 Mangum Judgment, Breycliffe had contracted to grant the assignment to Wolfswinkel, through West Valley Sun Valley Holdings, L.L.C. ("WVSV").[6] The Breycliffe/WVSV Agreement, dated June 28, 2002, required WVSV to pay the buyer's obligations under the 2002 Breycliffe Agreement before and at close of escrow.[7] As a result, in July 2002,

---

5. Brandon Wolfswinkel serves as president, manager, member, and/or shareholder for many of the approximately one hundred companies owned or operated by the Wolfswinkel family. Many of these companies are involved in the ownership and development of real estate, and the family controls roughly 80,000 acres of land, either through ownership or held in escrow.

6. The members of WVSV were Breycliffe (which owned twenty-five percent) and West Valley Ventures, L.L.C., an entity created and controlled by the Wolfswinkel family. Because of the prior civil judgments against him, Wolfswinkel did not hold assets in his name. This practice prevented judgment creditors from satisfying those judg-

ments. Further, Wolfswinkel's convictions prevented him from serving as an officer in a corporation. Accordingly, he instead operated as a "consultant" with respect to his family's various holdings. By the time of trial in October 2007, Wolfswinkel had purportedly discharged the judgments against him for a small fraction of their value.

7. The agreement also contained an indemnification provision. In the provision, WVSV acknowledged "that it is aware of the risk that the transactions contemplated by this Agreement could be the subject of litigation involving 10K and/or other parties," and WVSV agreed to indemnify Breycliffe in the event of such litigation.

WVSV began making quarterly payments of $205,100 and monthly payments of $45,000 to satisfy 10K's obligations to Spurlock under the 2002 Spurlock Agreement and Breycliffe's obligations to 10K under the 2002 Breycliffe Agreement. WVSV also agreed to give Phoenix Holdings the profit participation it had been seeking.

¶ 14 The 2002 Spurlock and Breycliffe Agreements (like the prior amended agreements dating back to 1998) were negotiated and executed on behalf of 10K by Phoenix Holdings. Disputes had arisen between Phoenix Holdings and the 10K members over numerous issues, however, including the propriety of the terms on which the 2002 litigation had been settled.[8] In July 2002, when 10K members learned of the Breycliffe/WVSV Agreement, they notified WVSV and Wolfswinkel that they objected to it and did not consider 10K bound by the terms of the 2002 Mangum Judgment or the 2002 Breycliffe Agreement because they believed Phoenix Holdings' actions as 10K's representative had been unauthorized and constituted fiduciary breaches, and thus were invalid and ineffectual. The members asserted that 10K was not obligated to close under the 2002 Breycliffe Agreement and would challenge the transaction, and they urged Wolfswinkel and WVSV to withdraw from the agreement with Breycliffe.

### III.   The 2003 Litigation

¶ 15 The objections raised by the 10K members were not resolved, however, and WVSV continued making payments under the 2002 Breycliffe Agreement. Consequently, on April 29, 2003, 10K sent a letter for-

mally notifying WVSV that 10K would not perform under that agreement. 10K also offered reimbursement if WVSV would withdraw as the buyer of the Sun Valley Property.

¶ 16 On May 1, 2003, WVSV, supported by Breycliffe, filed motions to intervene and for specific enforcement of the 2002 Mangum Judgment, seeking to compel the closing of the sale of the Sun Valley Property. That same day, the 10K investors filed a derivative action[9] against several parties, including the Phoenix Holdings defendants, Breycliffe, and WVSV, in superior court cause no. CV 2003–008362 ("the 2003 action" or "the 2003 litigation"). Among the claims asserted in the 2003 action was an Eighth Claim for Relief, requesting a declaratory judgment that the 2002 Breycliffe Agreement and WVSV's right as Breycliffe's assignee to purchase the Sun Valley Property were unenforceable.[10] On May 20, 2003, WVSV moved to dismiss 10K's declaratory relief claim as an impermissible collateral attack on a valid judgment, namely the 2002 Mangum Judgment.

¶ 17 The trial court (Judge Frank T. Galati, to whom the 2002 litigation had been reassigned) held a consolidated hearing on May 29, 2003, regarding WVSV's motions to transfer the 2003 action to that court, to dismiss the Eighth Claim for Relief in the 2003 action, to intervene in the 2002 litigation, and for specific enforcement of the 2002 Mangum Judgment. 10K and its members opposed WVSV's motions, arguing in part that the 2003 complaint established grounds for setting aside the 2002 Mangum Judgment

8.   10K contended in part that, because the previous amended 1998 Breycliffe Agreement had expired, Phoenix Holdings had been required by the operating agreement to seek the two-thirds supermajority approval of the 10K investors before re-extending the agreement with Breycliffe.

9.   *See* A.R.S. § 29–831.

10.   In the 2003 action, 10K contended that Phoenix Holdings, through Burns and Hickey, had breached its fiduciary duty as 10K's manager. The alleged breaches included multiple instances of financial self-dealing by Phoenix Holdings and Burns that 10K had purportedly uncovered in an audit of the project's books. Additionally, 10K alleged that, when the last deadline for the

amended 1998 Spurlock and Breycliffe Agreements expired in March 2002, Phoenix Holdings on behalf of 10K should have, at a minimum, used that opportunity to renegotiate a higher purchase price for the Sun Valley Property rather than enter a "new" deal with Breycliffe for the same price. 10K also alleged in the Eighth Claim for Relief that it was entitled to a judicial declaration that the amended 1998 Breycliffe Agreement had lapsed and, accordingly, any assignment WVSV had obtained could not be enforced. 10K asked the court to set aside that portion of the 2002 Mangum Judgment finding the 2002 Breycliffe Agreement was enforceable and directing the parties to complete the deal.

under the doctrine of extrinsic fraud perpetrated by Phoenix Holdings and with Breycliffe's knowledge, and sought to stay proceedings in the 2002 litigation pending the outcome of the 2003 action and to consolidate the 2002 litigation with the 2003 action.

¶ 18 A series of orders and judgments ("the Galati Judgments") followed: On June 2, 2003, the trial court issued a minute entry granting WVSV's motions and denying 10K's motions. In part, the court ruled that 10K's Eighth Claim for Relief was an impermissible collateral attack on the 2002 Mangum Judgment, and that its ruling granting WVSV's motion to dismiss the Eighth Claim for Relief was dispositive of WVSV's motion for specific enforcement of the 2002 Mangum Judgment. On June 16, 2003, 10K filed a motion for reconsideration, which the court denied on July 7, 2003.

¶ 19 Because the trial court had ruled on June 2 that 10K's Eighth Claim for Relief was an impermissible collateral attack, 10K moved for direct and partial relief from the 2002 Mangum Judgment pursuant to Rule 60(c), Ariz. R. Civ. P. On June 17, 2003, however, the trial court entered a final order in the 2002 litigation, in which the court granted WVSV's motions to intervene and for specific performance of the 2002 Mangum Judgment, denied 10K's motion for a stay of the proceedings, and ordered 10K to comply with the 2002 Mangum Judgment. Thus, 10K was effectively required to sell the Sun Valley Property to WVSV, and on July 16, 2003, WVSV proceeded to close escrow on the purchase of the Sun Valley Property. WVSV continued to service the debt on the property and purportedly invested millions of dollars in the development of the project.

¶ 20 Also on July 16, 10K filed a notice of appeal from the June 17 order, and on September 10, 2003, this court suspended the appeal and remanded to the trial court in part for consideration of 10K's Rule 60(c)

motion regarding the 2002 litigation. Final judgment on the Eighth Claim for Relief in the 2003 action was entered on August 21, 2003. On September 19, 2003, 10K filed a timely notice of appeal from the August 21 judgment. On November 19, 2003, the trial court denied 10K's Rule 60(c) motion. A final judgment was filed on December 23, 2003, and 10K filed a notice of appeal on December 31, 2003.

¶ 21 On January 23, 2004, this court granted 10K's motion to consolidate the various appeals, and designated case number 1 CA–CV 03–0584 as the primary case number.[11] The primary issue presented to this court was whether the alleged breach of trust by Phoenix Holdings, aided by Breycliffe, in obtaining the 2002 Mangum Judgment, constituted extrinsic fraud entitling 10K to invalidate the judgment. In our decision on appeal, we concluded that a judgment procured through extrinsic fraud may be collaterally attacked. *See 10K, L.L.C. v. W.V.S.V. Holdings, L.L.C.,* 1 CA–CV 03–0584, at *19–20 n. 11, ¶ 32 (Ariz.App. Jan. 25, 2005) (mem. decision). Reasoning, however, that the trial court had not erred in finding 10K had failed to adequately plead the existence of extrinsic fraud in the formation of the 2002 Mangum Judgment, we affirmed the court's dismissal of 10K's Eighth Claim for Relief as an impermissible collateral attack on that judgment:

> 10K was not deprived of an opportunity for a fair submission of the controversy in the 2002 litigation. In fact, 10K initiated the litigation as the plaintiff in the first lawsuit (and was a defendant in the second lawsuit) before the suits were consolidated. At best, it appears that an argument can be made that the actions of Phoenix Holdings were allegedly wrongful, not that the actions of Breycliffe or WVSV prevented 10K from pursuing the actions. 10K's claims against its agent remain pending in the lower court but, standing alone, do not

11. The appeals consolidated were taken from those formal judgments (the Galati Judgments) that subsequently implemented or reaffirmed the trial court's rulings in its June 2, 2003 minute entry. The appeal docketed as 1 CA–CV 03–0584 was from the June 17, 2003 judgment granting WVSV's motion to enforce the 2002 Mangum Judgment. An appeal docketed as 1 CA–CV 03– 0695 was from the August 21, 2003 judgment dismissing the Eighth Claim for Relief in the 2003 action. The third notice of appeal, filed from the December 23, 2003 order denying 10K's motion for relief from the 2002 Mangum Judgment under Rule 60(c), was deemed by this court as an amended notice of appeal in 1 CA– CV 03–0584.

serve to provide a basis to invalidate the 2002 Spurlock and Breycliffe Extensions or the 2002 [Mangum] Judgment. Moreover, we agree with the trial court that, in its Eighth Claim for Relief in the 2003 action, 10K failed to adequately plead the existence of extrinsic fraud in the formation of the 2002 [Mangum] Judgment. Thus, we conclude that, on that basis, the trial court did not err in dismissing 10K's Eighth Claim for Relief in the 2003 action as an impermissible collateral attack on the 2002 [Mangum] Judgment.

*Id.* at *21–22, ¶ 34. On September 25, 2005, the Arizona Supreme Court denied 10K's petition for review. Thus, although 10K's claims against the Phoenix Holdings defendants for alleged breaches of fiduciary duty remained, 10K could not at that time set aside that portion of the 2002 Mangum Judgment enjoining it to perform under the 2002 Breycliffe Agreement or ultimately unwind the sale of the Sun Valley Property to WVSV.

¶ 22 The parties returned to the trial court to litigate the remaining claims in the 2003 action. These claims now also included aiding and abetting claims against Breycliffe, WVSV, and Wolf swinkel.[12]

## IV. The 2006 Litigation

¶ 23 In June 2006, 10K served a supplemental disclosure statement concerning hundreds of pages of documents ("the Taylor documents") that 10K claimed proved Breycliffe was not an independent entity but was merely the instrumentality of Phoenix Holdings and its principals.

¶ 24 10K alleged that most of the Taylor documents had been contained on a secret computer disk, the existence of which Hickey's ex-wife, Sara Taylor Hickey ("Taylor"), had disclosed to two of the 10K investors (Gilbert and Beus) at their law firm on May 18, 2006. Taylor later provided the disk and a hard copy of much of its contents to 10K's counsel. The disk contained "dozens" of internal documents relating to the 10K/Phoenix Holdings/Breycliffe/WVSV disputes. If genuine, the Taylor documents showed that, to a large extent, the principals in Phoenix Holdings controlled, were affiliated with, or were in reality Breycliffe, and that Phoenix Holdings, Burns, and Hickey had conspired to further the interests of Phoenix Holdings and Breycliffe over those of 10K, thereby defrauding 10K, and ultimately the court.[13]

¶ 25 After obtaining the Taylor documents, 10K moved for sanctions against Phoenix Holdings, Burns, Hickey, and Breycliffe for non-disclosure of those documents. The defendants disavowed the documents and suggested they had been fabricated by the 10K members.[14]

¶ 26 On September 26, 2006, Judge Timothy J. Ryan (who had taken the 2003 case

---

12. In June 2003, after Judge Galati had ruled that 10K would be required to close escrow, 10K filed an amended complaint alleging that Breycliffe, WVSV, and Wolfswinkel had "aided and abetted" a breach of fiduciary duty committed by Phoenix Holdings, Burns, and Hickey.

13. In part, 10K learned specific details supporting the theory that, through subterfuge aided by a series of masked beneficiaries, Breycliffe was beneficially owned by a Lichtenstein trust held for the benefit of Patrick O'Connor, a resident of Ireland and Burns' long-time friend and business associate.

14. The circumstances under which the Taylor documents and the computer disk containing them were created and came into the possession of Beus, Gilbert, and the other 10K investors were contested. 10K contended that, in the midst of a contentious post-divorce dispute with Hickey, and faced with the possibility that she would not be able to see her children for one year due to a protective order entered by the family court, Taylor fortuitously discovered the disk and thus had a legitimate motive to provide it to 10K for the purpose of punishing and discrediting Hickey and Phoenix Holdings. 10K also contended Taylor "fear[ed] both for her safety and that Brent Hickey m[ight] retaliate against her for turning over the concealed documents." Shortly after the existence of the computer disk came to light in connection with the motion for sanctions filed in the 2003 action, 10K sought an affidavit from Taylor to establish that the disk had been found among the belongings of her ex-husband and that the electronic files on the disk constituted a "backup" of electronic documents on the hard drive of his laptop computer. Although Taylor provided an interview to 10K's counsel on June 30, 2006, she allegedly refused to sign a subsequent affidavit based on that interview.

At approximately that same time, Phoenix Holdings disclosed an unsworn statement purportedly signed and/or initialed by Taylor, in which she denied finding the disk among her ex-husband's belongings and stated it had been given to her by Beus, who had asked her to bring it

after remand) granted 10K's request for sanctions. After concluding that Hickey had not been honest in disavowing any connection to the computer disk or awareness of its existence, Judge Ryan determined that the Taylor documents belonged to Hickey and intertwined Phoenix Holdings with Breycliffe. Judge Ryan also found that Hickey and Breycliffe had intentionally and affirmatively violated the disclosure rules.

¶ 27 Meanwhile, on July 26, 2006, pursuant to Rule 60(c), the members of 10K filed another derivative lawsuit in superior court cause no. CV2006–011193 ("the 2006 action" or "the 2006 litigation") against Phoenix Holdings, Hickey, Burns, Breycliffe, and WVSV. 10K alleged that, based on the information contained in and subsequently discovered as a result of the Taylor documents, the 2003 Galati Judgments should be vacated as the product of extrinsic fraud.[15] In part, the complaint alleged as follows:

> The documents received from Sara [Taylor] Hickey expose the meticulously crafted and deceitful manner by which the Phoenix Holdings Defendants and Breycliffe secretly schemed to convert hundreds of millions of dollars of 10K's assets to their own selfish benefit, for a fraction of their fair value and with the unknowing and innocent validation of the Arizona Superior Court. These defendants then covered up the fraud by hiding and destroying evidence and manufacturing a fictional "united front" to ward off complaints by 10K when its members learned of the transactions. Only now has 10K been able to fit together the heretofore secret pieces of the corrupt puzzle that proves the calculated fraud perpetrated on 10K and this Court in 2002, and again in 2003 before Judge Galati.[16]

On August 9, 2007, WVSV filed an answer and cross-claim, noting that 10K's obvious purpose in filing the 2006 complaint was to ultimately overturn the sale of the Sun Valley Property from 10K to WVSV, the propriety of which WVSV disputed, and seeking actual, consequential, and punitive damages against the cross-defendants.

## V. Further Proceedings in the 2003 and 2006 Actions

¶ 28 In the meantime, on August 25, 2006, WVSV moved to consolidate the 2006 action

to his office and falsely claim she had found it among Hickey's possessions in exchange for a large monetary payment and her dismissal as a defendant in the still-pending 2003 action against the Phoenix Holdings defendants. Taylor refused to answer any questions at her deposition, citing the privilege against self-incrimination of the Fifth Amendment to the United States Constitution. Further, that was apparently the last known attempt to record her testimony before she was found dead in a swimming pool on July 27, 2008, shortly after her thirty-sixth birthday and the day before oral argument on summary judgment motions by 10K and WVSV in the 2006 action filed by 10K on July 26, 2006.

10K had an ethics expert review and segregate possible attorney-client privileged material before producing the disk's contents to the parties and the court, and had forensic computer experts and a handwriting expert authenticate the disk. An expert in international financial fraud, Jonathan M. Winer, examined the Taylor documents, and issued a detailed report in which he concluded that Phoenix Holdings was (or at least controlled) Breycliffe, and that Phoenix Holdings and Breycliffe had deliberately sabotaged 10K's ability to plead and prove its allegations by concealing or destroying evidence. Hickey issued a declaration vaguely denying authoring or possessing some of the Taylor documents and also suggesting that other documents, even if created by him, may have been altered. He did not, however, categorically deny the authenticity of each document on the disk and, in fact, acknowledged that "some of the documents appear to be similar or identical to documents [he] ha[d] prepared." Phoenix Holdings also offered a forensic analysis in connection with the motion for sanctions that it argued contradicted 10K's experts' analysis.

15. If 10K prevailed in the 2006 litigation, by extension, it could next seek to set aside the portion of the 2002 Mangum Judgment concerning the enforceability of the 2002 Breycliffe Agreement, thereby unwinding WVSV's purchase of the Sun Valley Property.

16. 10K maintained that, pursuant to the scheme to defraud it, Hickey had ghost-written correspondence for Breycliffe to Phoenix Holdings and third parties, and prepared scripts for Breycliffe when dealing with 10K, third parties, and Breycliffe's own counsel. 10K also maintained that the Phoenix Holdings defendants and O'Connor had inserted a straw man, Peter J. Bennett, to serve as a front for Breycliffe and authorize the 2002 Breycliffe Agreement, while providing Bennett with a written indemnity for his actions. Further, 10K claimed that Phoenix Holdings had secretly advised Breycliffe to "clean" its files by destroying evidence and to ensure that its United States representative kept no files.

with the 2003 action, and 10K filed a notice of joinder in the motion to consolidate. Judge Ryan initially granted the motion in September 2006, but shortly thereafter Burns filed a response opposing consolidation. At a December 2006 status conference, Judge Ryan ordered the cases unconsolidated after advising the parties that he had granted the consolidation for discovery and pretrial management purposes only and had not intended to consolidate the 2006 action into the previously scheduled trial of the 2003 action.[17] The 2006 action thus remained in abeyance and was ultimately transferred to Judge Richard J. Trujillo while the parties completed final discovery and trial preparation in the 2003 action.

¶ 29 In February 2007, as part of the 2003 action, 10K filed four motions for partial summary judgment, seeking judgment that (1) Phoenix Holdings was 10K's fiduciary, (2) Phoenix Holdings had breached its fiduciary duties to 10K, (3) 10K was entitled to a constructive trust over the Sun Valley Property, and (4) WVSV had aided and abetted Phoenix Holdings' breach of fiduciary duty. WVSV opposed the constructive trust and aiding and abetting motions, and filed cross-motions for summary judgment as to those issues.

¶ 30 Trial in the 2003 action was eventually set for October 2007. The case was transferred from Judge Ryan to Judge Edward O. Burke. In July 2007, 10K settled with Phoenix Holdings, Burns, Hickey, and Breycliffe in the 2003 action, leaving WVSV and Wolfswinkel as defendants facing a claim of aiding and abetting a breach of fiduciary duty.[18]

¶ 31 In August 2007, Judge Burke denied 10K's constructive trust motion and granted WVSV's cross-motion, concluding that the Galati Judgments, and specifically Judge Galati's dismissal of the Eighth Claim for Relief, was "law of this case and, although rendered in connection with a claim for declaratory judgment, it bars any remedies that could have been granted on the claim including the imposition of a constructive trust." Judge Burke also denied both sides' motions for summary judgment on the aiding and abetting claim.[19]

¶ 32 Also in August 2007, WVSV moved to transfer the 2006 action from Judge Trujillo to Judge Burke. 10K filed a notice of joinder and moved to consolidate the 2003 action with the 2006 action and continue the trial, arguing in part that the two cases should be tried together to avoid "piecemeal litigation" and forcing 10K into an election of remedies. WVSV opposed consolidation, and Judge Burke denied the motions to transfer, consolidate, and continue.

## VI.  Trial in the 2003 Action/Judge Burke's Rulings

¶ 33 Trial commenced in October 2007 on 10K's claim that WVSV and Wolfswinkel had aided and abetted Phoenix Holdings' breach of fiduciary duty to 10K. The theory 10K presented at trial was that WVSV and Wolfswinkel should be held liable for aiding and abetting Phoenix Holdings' breach of fiduciary duty and the ultimate wrong committed by Phoenix Holdings, Burns, Hickey, and

17.  Meanwhile, in November 2006, WVSV moved to dismiss the 2006 action under Rule 12(b)(6), Ariz. R. Civ. P., for failure to state a claim, arguing that the relief sought by the 2006 complaint was barred by law of the case established in this court's January 25, 2005 memorandum decision. At a January 31, 2007 hearing, Judge Ryan ordered that WVSV's motion be treated as a motion for summary judgment and directed that supplemental memoranda and statements of fact be filed by the parties after the date scheduled for trial in the 2003 action.

18.  In June 2008, the trial court issued its order approving 10K's settlement with the Phoenix Holdings defendants in the 2003 action. As to the 2006 action, 10K settled with Breycliffe in September 2007 and with Phoenix Holdings,

Burns, and Hickey in May 2008, leaving only WVSV. In July 2008, the court issued an order approving 10K's settlement with the Phoenix Holdings defendants in the 2006 action.

19.  Before trial, 10K moved for summary disposition of the unopposed motions for summary judgment on the existence and breach of Phoenix Holdings' fiduciary duties. Judge Burke initially granted the motions, holding that 10K no longer had to prove Phoenix Holdings' breach of fiduciary duty at trial. During trial, however, he reversed that decision, holding that because Phoenix Holdings had settled its claims with 10K, its summary judgment ruling was "moot." Thus, 10K was required at trial to prove Phoenix Holdings had breached a fiduciary duty to 10K.

Breycliffe in subjecting 10K to the 2002 Breycliffe Agreement and the 2002 Mangum Judgment. 10K contended that Phoenix Holdings had abandoned its fiduciary duties to 10K by consciously disregarding 10K's instruction not to transact business with Wolfswinkel and secretly arranging to transfer 10K's property on one-sided terms in return for a concealed profit participation from the ultimate beneficiary of the wrongdoing, WVSV. 10K further contended that WVSV was aware both of Phoenix Holdings' role as 10K's fiduciary and of Phoenix Holdings' allegedly improper actions in directing the sale of the Sun Valley Property to Breycliffe—a party on the other side of the bargain from 10K. 10K's damages evidence at trial was presented through the expert testimony of an economist, who calculated that the amount necessary to compensate 10K for the losses suffered as a result of having been forced to comply with the terms of the 2002 Breycliffe Agreement was $210,000,000.

¶ 34 Before trial, 10K moved in limine to preclude WVSV from objecting to evidence relating to Wolfswinkel's criminal history. 10K contended that this evidence was relevant to support and explain its contention that its members had informed Burns in June 2002 that they wanted no part in any business dealings with Wolfswinkel and had directed Phoenix Holdings to avoid such dealings. 10K also contended that the evidence was relevant for impeachment purposes, pursuant to Rule 609(b) of the Arizona Rules of Evidence.[20] WVSV responded by filing two motions in limine to preclude 10K from offering evidence of Wolfswinkel's convictions and the civil judgments entered against him. Judge Burke granted 10K's motion and denied WVSV's motions, allowing 10K to introduce the fact that, in 1993, Wolfswinkel had been convicted of nine felonies for crimes related to bank fraud, and that he had the two substantial civil judgments against him arising out of his business dealings.[21] During the trial, evidence of Wolfswinkel's convictions was introduced through the testimony of 10K members,[22] and Wolfswinkel testified at length, including regarding the circumstances surrounding his convictions and judgments. The court denied the parties' dispositive motions for judgment as a matter of law, see Ariz. R. Civ. P. 50, made at the close of 10K's case and at the close of evidence, and the case was submitted to the jury.[23]

¶ 35 On November 5, 2007, the jury returned a verdict in favor of 10K, awarding the requested amount of $210,000,000 in compensatory damages and finding the relative degrees of fault to be: 10K, 5 percent; Phoenix Holdings/Burns/Hickey, 80 percent; Breycliffe, 5 percent; and WVSV and Wolf-

20. Effective January 1, 2012, the Arizona Rules of Evidence were amended to generally conform to the recent restyling of the federal evidence rules. These amendments reflect an effort to make the rules more easily understood and to make style and terminology consistent throughout the rules. Most of the changes were intended to be stylistic only, and with respect to the rules at issue in this opinion there was no intent to change any result in any ruling on evidence and admissibility. Although our review in this case involves the evidence rules that were in existence when the trial court's rulings were made, because the recent changes to the evidence rules at issue were meant to be stylistic only, our citations are written to conform to both the current and former versions of the rules.

21. After Judge Burke granted 10K's motion, WVSV asked him to revisit his ruling and instruct the jury that the evidence relating to Wolfswinkel's past could be considered only as substantive evidence under Rule 404(b), Ariz. R. Evid., and not for impeachment purposes under

Rule 609. Judge Burke granted WVSV's motion over 10K's objection, stating that his previous ruling "was meant to be that introduction of the convictions ... will be limited to the 404(b) intent of the 10K partners not to do business with Mr. Wolfswinkel and that it won't be allowed in under 609 for impeachment because it's too old." 10K then moved in limine to preclude Wolfswinkel from testifying about the circumstances surrounding his convictions, and Judge Burke granted 10K's motion.

22. 10K presented testimony from Beus and at least one other 10K member that they had instructed Phoenix Holdings not to involve Wolfswinkel in any deal due to his history of criminal convictions and litigation.

23. Before the close of evidence, the court granted in part WVSV/Wolfswinkel's Rule 50 motion with regard to their liability for 10K's entry into the 2002 Breycliffe Agreement, entry of the 2002 Mangum Judgment, and intervening to seek enforcement of the 2002 Mangum Judgment.

swinkel, 10 percent.[24] Accordingly, WVSV and Wolfswinkel's share of compensatory damages was $21,000,000; however, the jury also awarded $150,000,000 in punitive damages against WVSV and Wolfswinkel.

¶ 36 On December 24, 2007, before entry of judgment on the verdict, WVSV filed a renewed Rule 50 motion, seeking judgment as a matter of law and, alternatively, a new trial. The principal thrust of the Rule 50 motion was that Wolfswinkel and WVSV could not be charged with tortious conduct when all they had done was rely and act on valid, final court judgments entered in 2002 and 2003. WVSV alternatively moved for a new trial based on the erroneous admission and/or alleged misuse of the Wolfswinkel convictions and civil judgments. WVSV contended that, after evidence of Wolfswinkel's convictions and civil judgments was introduced, 10K's counsel misused it by finding multiple ways to present it to the jury and had exceeded in closing argument the limited purpose for which the evidence was admitted.

¶ 37 On February 11, 2008, Judge Burke granted the Rule 50 motion and vacated the jury verdict. He granted judgment as a matter of law and, alternatively, if this court set aside his ruling, a new trial. In his ruling, he found that the Galati Judgments immunized WVSV and Wolfswinkel against any claim for aiding and abetting Phoenix Holdings' breach of fiduciary duty. He agreed with WVSV's premise that it could not be sued in tort for relying on validly entered judgments, and concluded that he had erred in failing to review and rely on this court's January 25, 2005 memorandum decision before trial to conclude "that there was no issue of fact for the jury to decide and the case should not have been presented to it."[25] He also found that 10K had exceeded the limited purpose for which the Wolfswinkel convictions and civil judgments were admitted and, accordingly, admission of

that evidence as used by 10K at trial had been unduly prejudicial to WVSV. In so ruling, he found that 10K repeatedly violated the ruling on the motion in limine when it "pilloried Wolfswinkel with repeated references to his convictions and judgments to attack his character," which "obviously" had an "overwhelming prejudicial effect" on the jury, especially in its consideration of punitive damages.

¶ 38 On June 4, 2008, the trial court entered final judgment, containing language pursuant to Rule 54, Ariz. R. Civ. P., in favor of WVSV and Wolfswinkel in the 2003 litigation. On July 2, 2008, 10K appealed from that judgment and the court's earlier denial of its constructive trust motion and grant of summary judgment to WVSV as to that issue, initiating the appeal docketed as 1 CA–CV 08–0567 in this court. WVSV and Wolfswinkel filed a timely cross-appeal, challenging the court's denial of their request for attorneys' fees and motion for sanctions pursuant to Rule 11, Ariz. R. Civ. P.

### VII. Judge Trujillo's Rulings and Their Effect

¶ 39 Meanwhile, the parties continued rebriefing WVSV's motion to dismiss/motion for summary judgment filed November 2006 in the 2006 action. On March 24, 2008, 10K filed its own motion for summary judgment, and WVSV responded with a crossmotion for summary judgment on the issue whether the Galati Judgments should be set aside.

¶ 40 The Taylor documents were the centerpiece of the briefing. 10K maintained that Phoenix Holdings and Breycliffe had perpetrated extrinsic fraud in connection with the Galati Judgments and were guilty of misconduct by failing to disclose the Taylor documents, and that the new details learned in those documents about the Phoenix Holdings/Breycliffe relationship allowed 10K to

---

24. The jury also specifically found via special interrogatory that WVSV and Wolfswinkel were not acting in concert with Phoenix Holdings, Burns, or Hickey.

25. Judge Burke also concluded that he had erred in not allowing the jury to consider the Galati Judgments and the circumstances surrounding them. In fact, however, both the 2002 Mangum Judgment and Judge Galati's June 2, 2003 minute entry were trial exhibits admitted into evidence and referenced during trial. Further, both parties sought instructions regarding the legal effect of these judgments. The record does not indicate that the trial court gave the proffered instructions.

make a prima facie claim not vulnerable to WVSV's motion for summary judgment.

¶ 41 In opposition, and in support of its own motion, WVSV contended that the Taylor documents constituted inadmissible hearsay and, even if admissible, could at best only create a question of fact precluding summary judgment in favor of 10K. WVSV also contended that, even had these documents been presented to Judge Galati in 2003, he would have ruled the same way, and the law of the case precluded summary judgment in 10K's favor. Finally, WVSV contended that, by proceeding with the trial in the 2003 action, 10K had of necessity made an election of remedies (damages), and could no longer seek to unwind the 10K/Breycliffe/WVSV agreements and the 2002 and 2003 judgments.

¶ 42 In a minute entry filed August 28, 2008, Judge Trujillo granted 10K's motion for summary judgment and denied WVSV's cross-motion for summary judgment, ruling in pertinent part as follows:

> IT IS ORDERED granting Plaintiff 10K LLC's Motion for Summary Judgment for all of the reasons presented by Plaintiff in its Memorandum of Points and Authorities, its argument in open court, and in its Joinder in Defendant W.V.S.V.'s Motion to Transfer and its Motion to Consolidate filed on August 23, 2007.

> Clearly, Plaintiff did not voluntarily choose or "elect" to proceed to trial in the 2003 case.

> Further, the Court finds that Plaintiff has made a "prima facie" presentation of "extrinsic fraud" in support of its claim for relief under Rule 60(c)(6). This finding is based on the alleged "incestuous relationship" between the Phoenix Holdings Defendants and Breycliffe which was not disclosed prior to the ruling by Judge Galati. Indeed, to deny Plaintiff such relief would only serve to exacerbate an extraordinary injustice, namely the opportunity to plead and present its case to a judge and jury, respectively.

> IT IS THEREFORE ORDERED setting aside the Judgment dismissing Plaintiff's 8th Claim for Relief in Cause No. CV2003–008362.

> IT IS FURTHER ORDERED denying Defendant W.V.S.V.'s Cross–Motion for [S]ummary Judgment.

Later, in an order filed November 25, 2008, Judge Trujillo set aside Judge Galati's June 17, 2003 order granting WVSV's motions to intervene and for specific performance of the 2002 Mangum Judgment, and the order requiring 10K to comply with that judgment. On February 12, 2009, WVSV's cross-claim against Breycliffe and the Phoenix Holdings defendants was dismissed by the court upon stipulation of the parties.

¶ 43 Based on Judge Trujillo's ruling, 10K sought to suspend the appeal to this court (in cause no. 1 CA–CV 08–0567) in order to seek Rule 60(c) relief from the judgment as a matter of law entered in the 2003 action. See Ariz. R. Civ. P. 60(c). On December 4, 2008, this court suspended that appeal for purposes of such motion.

¶ 44 On January 5, 2009, 10K filed its motion for relief from judgment pursuant to Rule 60(c). 10K argued that, in light of the fact that the Galati Judgments had been vacated, Judge Burke's post-trial rulings should be vacated, judgment entered on the original jury verdict, and a constructive trust imposed. WVSV contended that, notwithstanding vacatur of the Galati Judgments, Judge Burke's post-trial rulings should remain intact. In part, WVSV contended that it had acted in reliance on the Galati Judgments and its interests in doing so precluded relief pursuant to the Restatement (Second) of Judgments.

¶ 45 On February 9, 2009, Judge Burke revised his earlier rulings in the 2003 action in light of Judge Trujillo's rulings. Concluding that WVSV and Wolfswinkel could not, as a matter of law, "rely on a judgment obtained by fraud on the court," Judge Burke modified his order to deny WVSV's motion for judgment as a matter of law. He affirmed, however, his earlier decision granting the motion for new trial based on the admission and use of Wolfswinkel's convictions. Judge Burke also rejected WVSV's reliance argument, stating that he presumed Judge Trujillo had considered the impact of WVSV's reliance on the Galati Judgments

before granting summary judgment in favor of 10K and vacating those judgments:

Having reviewed 10K's Motion for Summary Judgment which led to Judge Trujillo's ruling, this court is aware that he did not render his decision in a vacuum but, rather, the effect of the Galati Judgment was placed squarely before him. See 10K Motion for Summary Judgment p. 2 and it[ ]s Statement of Facts in Support of the Motion for Summary Judgment. Thus Judge Trujillo had to have considered the effect of his ruling on the judgment rendered in this case and presumably this court's February 11, 2008, ruling.

¶ 46 On March 23, 2009, Judge Burke vacated his prior decision to grant WVSV's cross-motion for partial summary judgment on 10K's request for a constructive trust and denied the motion, but also affirmed his prior denial of 10K's request for a constructive trust. He issued a signed final order memorializing those rulings that same day. 10K filed a timely amended notice of appeal.

¶ 47 Contending that the reliance issue had not been expressly articulated in the summary judgment papers before Judge Trujillo, WVSV filed a motion for new trial in the 2006 action on February 24, 2009, arguing that its reliance on the Galati Judgments precluded relief. Judge Trujillo denied WVSV's motion for new trial in the 2006 action, and on June 10, 2009, he issued a final judgment granting 10K's motion for summary judgment and denying WVSV's cross-motion for summary judgment. Judge Trujillo vacated the Galati Judgments[26]; ordered WVSV to pay restitution in the amount of $151,960.35 plus interest to 10K for prior attorneys' fees, costs, and interest paid by 10K to WVSV pursuant to the vacated Galati Judgments; and awarded attorneys' fees in the amount of $145,000.00 and costs in the amount of $245.00 to 10K. WVSV filed a timely notice of appeal from the judgment. That appeal was docketed as 1 CA–CV 09–0445 in this court.

¶ 48 This court consolidated the appeals in 1 CA–CV 08–0567 and 1 CA–CV 09–0445,

and designated 1 CA–CV 08–0567 as the primary case number. We have jurisdiction pursuant to A.R.S. §§ 12–120.21(A)(1) and 12–2101(A)(1)–(2) and (5)(a).

## ANALYSIS

### I. WVSVs Appeal in the 2006 Litigation (1 CA–CV 09–0445)

¶ 49 We first address WVSV's appeal from Judge Trujillo's grant of summary judgment in favor of 10K and denial of WVSV's cross-motion for summary judgment in the 2006 litigation, which vacated the Galati Judgments in the 2003 litigation. To the extent that the arguments intertwine and it is expedient, we also address in this section issues raised in the cross-appeal filed by WVSV and Wolfswinkel in the 2003 litigation (1 CA–CV 08–0567). In the next section, we address 10K's appeal in the 2003 litigation and the issues remaining from the cross-appeal.

### A. Summary Judgment Vacating the Galati Judgments

¶ 50 WVSV argues that Judge Trujillo erred in granting summary judgment in favor of 10K—thereby vacating the Galati Judgments—and denying WVSV's cross-motion for summary judgment, because 10K produced no admissible evidence of misconduct in connection with the Galati proceedings, 10K's attack on the Galati Judgments was barred by law of the case and its previous election of remedies, and WVSV had placed substantial, prolonged, and justified reliance on those judgments. We disagree.

¶ 51 In general, we review for an abuse of discretion the trial court's decision to set aside a judgment pursuant to Rule 60(c). City of Phoenix v. Geyler, 144 Ariz. 323, 328, 697 P.2d 1073, 1078 (1985). In determining whether the trial court abused its discretion, however, we review de novo the court's grant of summary judgment and its application of the law. Andrews v. Blake, 205 Ariz. 236, 240, ¶ 12, 69 P.3d 7, 11 (2003); State Comp. Fund v. Yellow Cab Co., 197 Ariz. 120, 122, ¶ 5, 3 P.3d 1040, 1042 (App.1999). In our

---

**26.** Specifically, Judge Trujillo vacated Judge Galati's June 17, 2003 order, which had granted WVSV's motions to intervene and for specific performance of the 2002 Mangum Judgment, and the August 21, 2003 judgment dismissing 10K's Eighth Claim for Relief in the 2003 action.

review, we construe the facts and reasonable inferences in the light most favorable to the opposing party. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund,* 201 Ariz. 474, 482, ¶ 13, 38 P.3d 12, 20 (2002); *Strojnik v. Gen. Ins. Co. of Am.,* 201 Ariz. 430, 433, ¶ 10, 36 P.3d 1200, 1203 (App.2001). Summary judgment is proper if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Orme Sch. v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990); Ariz. R. Civ. P. 56(c)(1). Further, we will affirm summary judgment if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that no reasonable person could find for its proponent. *Orme Sch.,* 166 Ariz. at 309, 802 P.2d at 1008. Thus, the mere existence of a "scintilla" of evidence that creates the "slightest doubt" is insufficient to withstand a motion for summary judgment. *Id.*

▮ ¶ 52 The presence of extrinsic fraud, which includes "deception practiced by the successful party in purposely keeping his opponent in ignorance," *Bates v. Bates,* 1 Ariz.App. 165, 168, 400 P.2d 593, 596 (1965) (citing *Honk v. Karlsson,* 80 Ariz. 30, 34, 292 P.2d 455, 458 (1956)), may justify vacating a prior judgment. *See Dockery v. Cent. Ariz. Light & Power Co.,* 45 Ariz. 434, 454, 45 P.2d 656, 664 (1935). "Relief is granted for extrinsic fraud on the theory that by fraud or deception practiced on the unsuccessful party, he has been prevented from fully exhibiting and trying his case, by reason of which there never has been a real contest before the court of the subject matter of the suit." *Id.* at 451, 45 P.2d at 662. "In a case involving a fiduciary relationship, ... the fiduciary has a duty to deal fairly, not fraudulently, and to disclose the true facts, not deceive. A breach of this duty may constitute extrinsic fraud." *In re Estate of Thurston,* 199 Ariz. 215, 219, ¶ 21, 16 P.3d 776, 780 (App. 2000) (citing *In re Estate of Olivas,* 132 Ariz. 61, 63, 643 P.2d 1031, 1033 (App.1982)); *see also Norwest Bank (Minn.), N.A. v. Symington,* 197 Ariz. 181, 186–88, ¶¶ 20–32, 3 P.3d 1101, 1106–08 (App.2000) (recognizing that the failure to disclose information that may be relevant may constitute misconduct

justifying relief from a judgment). "Moreover, if a fiduciary who speaks falsely or refuses to reveal the truth also personally profits by his fraudulent conduct, that conduct will justify intervention by the court even in a collateral proceeding." *Thurston,* 199 Ariz. at 219, ¶ 21, 16 P.3d at 780 (citing *In re Sullivan's Estate,* 51 Ariz. 483, 495, 78 P.2d 132, 137 (1938)).

▮ ¶ 53 A party seeking relief from a judgment based on nondisclosure must establish the existence and non-disclosure of the evidence in question. *See generally Norwest Bank,* 197 Ariz. at 185–87, ¶¶ 15–23, 3 P.3d at 1105–07. Further, to obtain relief from an existing final judgment, the party must demonstrate the existence of a prima facie defense to the entry of that judgment. *See Ariz. Mining & Trading Co. v. Benton,* 12 Ariz. 373, 378, 100 P. 952, 954 (1909) (requiring a party seeking relief from a judgment based on fraud or collusion to present "facts sufficient to show prima facie a valid defense"); *see also Richas v. Superior Court,* 133 Ariz. 512, 517, 652 P.2d 1035, 1040 (1982) (requiring an appellant to "set forth facts which, if proved at the trial, would constitute a meritorious defense" to entry of a default judgment); *Union Oil Co. of Cal. v. Hudson Oil Co.,* 131 Ariz. 285, 289, 640 P.2d 847, 851 (1982) (requiring that a motion to set aside a default judgment be supported "with facts which, if proven at trial, would constitute a meritorious defense" (citations omitted)).

¶ 54 Thus, for 10K to prevail on summary judgment and obtain relief from the Galati Judgments, 10K was required to present admissible evidence showing that Phoenix Holdings and Breycliffe wrongfully withheld information during the 2003 litigation leading to the Galati Judgments and that the nondisclosed information, showing Phoenix Holdings' and Breycliffe's identity of interest and complicity in defrauding 10K and concealing the information, provided 10K a prima facie defense to entry of those judgments. We hold 10K made this showing.

*1. Admission of the Evidence of Misconduct*

¶ 55 WVSV first argues that it, rather than 10K, was entitled to summary judgment in

the 2006 litigation because 10K failed to present admissible evidence of misconduct in connection with the 2003 Galati proceedings. Specifically, WVSV maintains that the Taylor documents constitute inadmissible hearsay and their authenticity should be questioned.

¶ 56 WVSV notes that, in moving for summary judgment based on the Taylor documents, 10K submitted the deposition testimony of Beus regarding what Taylor told him about the source of the computer disk. WVSV maintains that Beus's recounting of those statements was hearsay and could not have been used to authenticate the Taylor documents. *See Portonova v. Wilkinson*, 128 Ariz. 501, 502, 627 P.2d 232, 233 (1981) (stating that, for purposes of summary judgment, affidavits based on inadmissible hearsay are insufficient to counter sworn statements based on personal knowledge (citing *Jabczenski v. S. Pac. Mem'l Hosps.*, 119 Ariz. 15, 18–19, 579 P.2d 53, 56–57 (App.1978))); *Villas at Hidden Lakes Condos. Ass'n v. Geupel Constr. Co.*, 174 Ariz. 72, 82, 847 P.2d 117, 127 (App.1992) (holding that inadmissible hearsay statements were insufficient to support a motion for summary judgment). *See also Birchfield v. Thiercof*, 5 Ariz.App. 484, 487, 428 P.2d 148, 151 (1967) (concluding that documents unauthenticated by proper affidavit lent no support to the summary judgment rendered).

■ ¶ 57 Beus's statement of fact that Taylor gave the documents to him was based on his own knowledge and is not by itself inadmissible hearsay. *See State v. Printz*, 125 Ariz. 300, 303, 609 P.2d 570, 573 (1980). Additionally, because she was a defendant in the 2003 action when she spoke to Beus, Taylor's statements regarding her discovery of the documents and her belief that the documents contained important information related to the litigation were admissible as statements of a party opponent. *See* Ariz. R. Evid. 801(d)(2) (providing that admissions by an opposing party are not hearsay); *Henry ex rel. Estate of Wilson v. HealthPartners of*

S. Ariz., 203 Ariz. 393, 395–96, ¶¶ 7–10, 55 P.3d 87, 89–90 (App.2002) (concluding that factual allegations made in a plaintiff's complaint against a physician who was a named defendant in a medical malpractice action but settled before trial were admissible against the plaintiff as statements of a party opponent in the subsequent trial involving another defendant). Also, even if the statements were hearsay, they were admissible as clear statements against the now-deceased Taylor's pecuniary interest.[27] *See* Ariz. R. Evid. 804(a)(4), (b)(3) (providing an exception to the hearsay rule for a statement against interest by an unavailable declarant).

■ ¶ 58 Further, substantial evidence and reasonable inferences support 10K's claim that the Taylor documents are authentic. *See generally* Ariz. R. Evid. 901(a) (stating that the requirement of authenticating or identifying an item of evidence as a condition precedent to admissibility is satisfied when the proponent produces evidence sufficient to support a finding that the item in question is what its proponent claims); *State v. Lavers*, 168 Ariz. 376, 386, 814 P.2d 333, 343 (1991) (discussing Rule 901(a), Ariz. R. Evid.). In addition to declarations from Gilbert and Beus, 10K presented testimony from a forensic document examiner who opined that the handwritten labels on the disk and its case were in the handwriting of Hickey and that Hickey's handwriting was prevalent in the Taylor documents; Hickey admitted that his handwriting was on some of the documents; some of the documents were identical to those produced in the 2003 action; some documents included personal information belonging to Hickey, and some referenced unrelated real estate deals involving Phoenix Holdings; and 10K's forensic experts indicated that no documents on the computer disk had been altered after the date the files were copied or saved (September 1, 2003), and there was no evidence to contradict the metadata indicating Hickey had created the documents on the disk. Additionally, the Taylor

**27.** Moreover, although WVSV intimates otherwise, in general, the mere fact that Taylor and Hickey were by that time divorced did not absolve Taylor of potential liability for acts committed against 10K during her marriage to Hickey. *See generally Cmty. Guardian Bank v. Hamlin,*

182 Ariz. 627, 631, 898 P.2d 1005, 1009 (App. 1995) (recognizing that a divorce court's allocation of community obligations does not affect the rights of third party creditors, including judgment creditors, who cannot be bound by the divorce allocation).

documents included a one-page indemnity agreement separate from the computer disk, in which Burns agreed to indemnify Peter Bennett, sent to Bennett by Hickey. We find no error in the trial court's consideration of the Taylor documents for purposes of these proceedings.[28]

## 2. This Court's Prior Ruling/Law of the Case

¶ 59 WVSV next argues that it was entitled to summary judgment dismissing 10K's complaint attacking the Galati Judgments because this court's decision in the prior appeal establishes that 10K's complaint in the 2006 action fails as a matter of law. We disagree.

¶ 60 The doctrine of "law of the case" provides that "when a judgment is affirmed by [an appellate] court, all questions raised by the assignments of error and all questions that might have been so raised are to be regarded as finally adjudicated against the appellant." *Pac. Greyhound Lines v. Brooks*, 70 Ariz. 339, 343, 220 P.2d 477, 479 (1950) (quoting *State ex rel. Galbraith v. Superior Court*, 22 Ariz. 452, 458, 197 P. 537, 539 (1921)). Thus, "the trial court is absolutely bound by the decision and mandate of an appellate court and [ ] it is not within the jurisdiction of the trial court to review the appellate court's determination." *Tovrea v. Superior Court*, 101 Ariz. 295, 297, 419 P.2d 79, 81 (1966) (citations omitted).

¶ 61 The doctrine of "law of the case" is a rule of policy, however, not of law, for which many exceptions exist, including when there has been a change in the essential facts or issues or an issue was not actually decided in the first decision. *Dancing Sunshines Lounge v. Indus. Comm'n*, 149 Ariz. 480, 482–83, 720 P.2d 81, 83–84 (1986); *see also* Ariz. R. Civ. P. 60(c) ("This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order or proceeding, or to ... set aside a judgment for fraud upon the court. The procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action."). Extrinsic fraud, "which operates upon the manner in which the judgment was procured," may be grounds for a collateral attack on the judgment. *See Roberson v. Teel*, 20 Ariz.App. 439, 449, 513 P.2d 977, 987 (1973) (stating that, under *Dockery*, extrinsic fraud "is grounds for a collateral attack upon the judgment").

¶ 62 In this case, the Taylor documents not only revealed evidence of possible breaches of fiduciary duty on the part of Phoenix Holdings, but also contained previously undiscovered evidence not considered by this court of collusion and conspiracy between Phoenix Holdings and Breycliffe. The documents revealed Phoenix Holdings' apparent manipulation of, control over, and/or joint identity with Breycliffe, while demonstrating the full extent of the improper ac-

---

28. WVSV cites several federal cases for the proposition that when fact issues are raised in a motion for relief from judgment, an evidentiary hearing should be held. *See Steverson v. Global-SantaFe Corp.*, 508 F.3d 300, 304–06 (5th Cir. 2007); *Sheng v. Starkey Labs., Inc.*, 53 F.3d 192, 194–95 (8th Cir.1995); *FDIC v. Alker*, 234 F.2d 113, 117 (3rd Cir.1956); *In re Estate of Sewer*, 332 F.Supp.2d 817, 823 (D.Vi.2004). WVSV maintains that the trial court therefore erred in ruling without such a hearing.

WVSV failed to request an evidentiary hearing before the trial court and, further, develops this argument for the first time on appeal in its reply brief; accordingly, WVSV has waived the argument. *See Brake Masters Sys., Inc. v. Gabbay*, 206 Ariz. 360, 365, ¶ 15, 78 P.3d 1081, 1086 (App. 2003); *Jones v. Burk*, 164 Ariz. 595, 597, 795 P.2d 238, 240 (App.1990). Moreover, even assuming *arguendo* that the argument is not waived, we find it unavailing. The trial court

(Judge Ryan) previously weighed and considered Hickey's testimony—and wholly rejected it—in deciding 10K's motion for sanctions in the 2003 litigation. Thus, based on the findings of Judge Ryan, Judge Trujillo could have correctly concluded that Hickey's vague statements contained no more than a scintilla of probative value. *See Orme Sch.*, 166 Ariz. at 309, 802 P.2d at 1008; *see also Breitbart–Napp v. Napp*, 216 Ariz. 74, 82 n. 5, ¶ 30, 163 P.3d 1024, 1032 n. 5 (App.2007) (concluding that the trial court was not required to hold an evidentiary hearing when "sufficient evidence existed in the form of additional affidavits and previous evidence before the court"). Indeed, WVSV's counsel recognized the import of Judge Ryan's ruling at oral argument on the motion for sanctions when counsel stated, "If these documents are genuine, they go to the very heart of the case and, it seems to me, should result in the ultimate sanction, because they do go to the heart of the case."

tions of the Phoenix Holdings defendants and Breycliffe, including actively concealing their actions from 10K and its members. Consequently, the trial court did not err by declining to apply the doctrine of "law of the case" to these facts.

### 3. 10K's "Election" of an Inconsistent Remedy

¶ 63 Arguing that 10K could either seek to rescind the 2002 Breycliffe Agreement or seek damages, but not do both, WVSV maintains that it was entitled to summary judgment dismissing 10K's attack on the Galati Judgments because 10K's "election" of a damages remedy in the 2003 action constituted an "affirmance" of the 2002 Breycliffe Agreement and barred the recessionary remedy ultimately sought by 10K in the 2006 action. We disagree.

¶ 64 "The doctrine of election of remedies precludes pursuit of two inconsistent remedies based on the same claim." *Phillips v. Adler*, 134 Ariz. 480, 482, 657 P.2d 893, 895 (App.1982) (citing *Malisewski v. Singer*, 123 Ariz. 195, 197, 598 P.2d 1014, 1016 (App.1979)). "A party who has been defrauded is put to an election of remedies, i.e. he may either rescind the contract or affirm the contract and sue for damages, but he cannot do both." *Jennings v. Lee*, 105 Ariz. 167, 171, 461 P.2d 161, 165 (1969).

¶ 65 Given the Galati Judgments and this court's subsequent January 25, 2005 memorandum decision, 10K was effectively compelled to seek damages if it wished to obtain relief in the 2003 litigation. Further, consistent with its attempts to seek rescission as a possible remedy, 10K requested imposition of a constructive trust over the Sun Valley Property and moved to consolidate the 2003 action with the 2006 action. In light of the entire record, including the procedural status

of these cases, it cannot be fairly concluded that 10K "elected its remedy by waiting too long to seek consolidation" of the 2003 and 2006 actions or that it in any other way made a "voluntary" election of remedies. *See generally Amber Res. Co. v. United States*, 538 F.3d 1358, 1377 (Fed.Cir.2008) (explaining that the doctrine of election of remedies "does not allow court-ordered performance to count as an election"); *Leavitt v. Cont'l Tel. Co. of Maine*, 559 A.2d 786, 787–88 (Me.1989) (holding that a stipulated judgment did not constitute a voluntary election of remedies because the plaintiffs "were proceeding on the only basis remaining after the court's in limine ruling"), *superseded by statute on other grounds as recognized in Fuschetti v. Murray*, 903 A.2d 848, 852 (Me.2006). Judge Trujillo did not err in concluding that 10K "did not voluntarily choose or 'elect' to proceed to trial in the 2003 case." Moreover, if 10K's various claims are subject to the doctrine of election of remedies, 10K may yet elect its remedy on remand.[29] *See Vinson v. Marton & Assocs.*, 159 Ariz. 1, 4, 764 P.2d 736, 739 (App.1988) (stating that a plaintiff cannot be compelled to elect its remedies before the conclusion of a trial and may move to amend its complaint to conform to evidence adduced at trial).

### 4. WVSV's Reliance on the Galati Judgments

¶ 66 WVSV argues that, even if 10K did establish that the Galati Judgments were procured by extrinsic fraud, Judge Trujillo erred in vacating those judgments and denying WVSV's motion for new trial in the 2006 action because WVSV was an innocent party that had placed substantial, prolonged, and justified reliance on the judgments before they were set aside.[30] We review the trial court's denial of a motion for new trial for an

---

**29.** Our resolution of the issue on this basis renders unnecessary the need to decide in this appeal 10K's argument that its claim seeking rescission and its tort claim against WVSV for aiding and abetting damages might fairly be characterized as wholly separate causes of action governed by separate material elements and facts, such that an election of remedies is not required. *See generally Landin v. Ford*, 151 Ariz. 273, 275–76, 727 P.2d 326, 328–29 (App.1985).

**30.** On cross-appeal in 1 CA–CV 08–0567, WVSV makes a substantially similar argument, arguing that even if the Galati Judgments were properly vacated by Judge Trujillo, WVSV was entitled to judgment as a matter of law in the 2003 litigation because WVSV acted in justified reliance on those judgments before they were set aside. Our resolution of this issue addresses both of WVSV's reliance arguments.

abuse of discretion. *Boatman v. Samaritan Health Servs., Inc.,* 168 Ariz. 207, 212, 812 P.2d 1025, 1030 (App.1990). Even assuming *arguendo* that WVSV did not waive its reliance argument in the 2006 litigation,[31] we find the argument unavailing.

¶ 67 As support for its reliance argument, WVSV cites § 74 of the Restatement (Second) of Judgments (1982) ("the Restatement").[32] Under § 70 of the Restatement, a judgment in a contested action may be avoided if the judgment was procured by, *inter alia,* fraud. *See* Restatement (Second) of Judgments § 70(1)(b) & cmt. a. Section 70 is, however, "[s]ubject to the limitations stated in § 74." Section 74 of the Restatement, entitled "Denial or Limitation of Relief," provides in pertinent part as follows:

> Except with regard to judgments referred to in §§ 65–66 and 69 [sections inapplicable here], relief from a judgment will be denied if ... [g]ranting the relief will inequitably disturb an interest of reliance on the judgment. When such an interest can be adequately protected by giving the applicant limited or conditional relief, the relief will be shaped accordingly.

Restatement (Second) of Judgments § 74(3). Comment (a) to § 74 further provides that "[t]his Section applies whether the judgment from which relief is sought is 'void' or 'merely voidable,'" and notes that "when a substantial reliance interest is involved or when the delay in seeking relief is unreasonably long, courts often deny relief by characterizing the judgment under attack as being 'merely voidable.'"

¶ 68 Our supreme court, however, has previously recognized that "[f]raud vitiates everything which it touches, and when fraud has been committed by the party in whose favor the judgment was rendered, it may be vacated at any time upon a proper showing made by the injured party." *Vazquez v. Dreyfus,* 34 Ariz. 184, 189, 269 P. 80, 81 (1928); *accord Lockett v. Drake,* 43 Ariz. 357, 361, 31 P.2d 499, 500 (1934) (stating "that fraud vitiates every transaction to which it is an essential part"). Contrary to WVSV's contention, if judgments were wholly immune from attack and provided complete immunity to those relying on them in all circumstances, it would provide a powerful incentive for parties to use fraudulent tactics in obtaining a judgment. *See* Restatement (Second) of Judgments § 70, cmt. a.

¶ 69 In this case, 10K filed the 2006 litigation seeking to overturn the Galati Judgments almost immediately after learning of the Taylor documents. Further, WVSV's own member, Breycliffe, actively participated with Phoenix Holdings in perpetrating the extrinsic fraud committed on 10K that resulted in those judgments. And, as Breycliffe's assignee, WVSV "stands in the shoes" of Breycliffe, and generally cannot claim rights and remedies beyond those which Breycliffe would have had. *See, e.g., Bertozzi v. Collaso,* 21 Ariz. 388, 392, 188 P. 873, 874 (1920) ("As respects the right to the thing sold, the assignee stands in the shoes of his assignor." (citation omitted)), *abrogated on other grounds by Sertich v. Moorman,* 162 Ariz. 407, 412, 783 P.2d 1199, 1204 (1989); *Hunnicutt Constr., Inc. v. Stewart Title & Trust of Tucson Trust No. 3496,* 187 Ariz. 301, 304, 928 P.2d 725, 728 (App.1996) (recognizing that the assignee of a beneficial interest in a note and deed of trust takes only the rights and remedies of the assignor) (citing *Van Waters & Rogers, Inc. v. Interchange Res., Inc.,* 14 Ariz.App. 414, 417, 484 P.2d 26, 29 (1971)); *Dunn v. Progress Indus., Inc.,* 153 Ariz. 62, 65, 734 P.2d 604, 607 (App.1986)

---

**31.** Although 10K concedes that WVSV timely raised its reliance argument in the 2003 litigation, 10K maintains that both the jury and Judge Burke ultimately rejected the argument in the 2003 litigation before WVSV raised it for the first time in the 2006 litigation, and therefore WVSV waived its reliance argument in the 2006 litigation by raising it for the first time in its motion for new trial. Nevertheless, in denying the motion for new trial in the 2006 litigation, Judge Truijillo did not find that the motion or argument therein was untimely.

**32.** Arizona courts have not previously adopted § 74 of the Restatement (Second) of Judgments, and only one Arizona opinion has mentioned that section of the Restatement. *See Sprang v. Petersen Lumber, Inc.,* 165 Ariz. 257, 264, 798 P.2d 395, 402 (App.1990) (declining to apply § 74 because it "specifically excludes §§ 65 and 66 dealing with default judgments"). In the absence of case law to the contrary, however, we generally follow the Restatement when applicable. *Porter v. Porter,* 101 Ariz. 131, 145, 416 P.2d 564, 578 (1966).

("[A]n assignee stands in 'no better position than the assignor.'" (citations omitted)); Restatement (Second) of Contracts § 336, cmt. b (1981) ("The assignee's right depends on the validity and enforceability of the contract creating the right....").

¶ 70 Given the intertwined relationships of Phoenix Holdings and Breycliffe, and of Breycliffe and WVSV, we cannot conclude on this record that the trial court abused its discretion in denying WVSV's motion for new trial predicated on its claim that it was an innocent party that had placed substantial, prolonged, and justified reliance on the Galati Judgments.[33] *See* Restatement (Second) of Judgments § 74, cmts. c ("Protection of third party interests involves chiefly the question whether the third party reliance was innocent and justified, the classic instance being the bona fide purchaser for value."), g (requiring the trial court to exercise "sound discretion" by taking into account various factors in determining whether to grant relief, including "the magnitude and consequences of the judgment, the relative clarity with which it appears that the judgment was unjust, the relative fault of the parties ... the equities in the interests of reliance ... [and] the balance to be struck between finality and correctness of judgments").

¶ 71 WVSV is not entitled to equitable relief unless it played no role in obtaining the fraudulent judgments—either actively, through participation, or passively, through knowledge and acquiescence. *See generally Byers v. Wik*, 169 Ariz. 215, 224, 818 P.2d 200, 209 (App.1991) ("He who seeks equity must do equity."). Here, the record lends support to the conclusion that WVSV had an active role to the extent that Breycliffe (a member and assignor of WVSV) directly participated in the breach of Phoenix Holdings' fiduciary duty to 10K, and WVSV, supported by its member Breycliffe, intervened in the 2002 litigation and sought specific enforcement of the 2002 Mangum Judgment, as well as participated in the 2003 action that produced the Galati Judgments. WVSV also arguably had a passive role to the extent that Wolfswinkel and WVSV were put on notice before the Galati Judgments that the 10K members considered the 2002 Breycliffe Agreement to be a nullity because Phoenix Holdings had exceeded its authority in consummating the agreement without obtaining a two-thirds supermajority approval from the members of 10K. Accordingly, a balance of the equities with regard to WVSV's reliance argument in its appeal of the 2006 action appears to fall decidedly against WVSV.[34]

¶ 72 We therefore affirm Judge Trujillo's grant of summary judgment in favor of 10K and denial of WVSV's cross-motion in the 2006 action. Judge Trujillo did not abuse his discretion in setting aside the Galati Judgments pursuant to Rule 60(c), Ariz. R. Civ. P., or otherwise err in granting summary judgment in favor of 10K as to this issue.[35]

33. Additionally, the facts surrounding WVSV's acquisition of the assignment of Breycliffe's position and eventual purchase of the Sun Valley Property, including the payment of $50,000 by Wolfswinkel to Hickey before the Breycliffe/WVSV Agreement, the inclusion of Phoenix Holdings in a profit participation agreement, WVSV's acknowledgment in the June 28, 2002 Breycliffe/WVSV Agreement "that it is aware of the risk that the transactions contemplated by this Agreement could be the subject of litigation involving 10K and/or other parties," and WVSV's apparent willful failure to investigate upon learning facts placing it on inquiry notice of 10K's claims, lend support to the inference that WVSV may not have been a bona fide purchaser for value. *See generally Warren v. Whitehall Income Fund 86*, 170 Ariz. 241, 243, 823 P.2d 689, 691 (App.1991) (stating that a purchaser with constructive notice of a prior claim on property "is not a bona fide purchaser"); *see also Davis v. Kleindienst*, 64 Ariz. 251, 258–59, 169 P.2d 78,

83 (1946) (requiring a buyer of property put on inquiry notice to exercise due diligence in order to qualify for status as a bona fide purchaser); *U.S. Fiduciary Corp. v. Loma Vista Assocs.*, 138 Ariz. 464, 468, 675 P.2d 724, 728 (App.1983) (same); Restatement (First) of Restitution § 175(1) (1937) ("[A] transferee of property is not a bona fide purchaser if at any time prior to the transfer he has notice of the facts giving rise to a constructive trust of the property, although he gives value before he has notice.").

34. Given the above reasoning, WVSV was not entitled to judgment as a matter of law in the 2003 action based on its assertion that its reliance on the existence of the Galati Judgments in 2003 immunized it from 10K's aiding and abetting claim.

35. As we have recognized, in February 2008, Judge Burke vacated the jury verdict in the 2003 action and entered judgment as a matter of law

## B. The Award of Restitution to 10K

¶ 73 WVSV also argues that the trial court (Judge Trujillo) erred in awarding restitution "damages" to 10K in the amount of the attorneys' fees previously granted to WVSV and paid by 10K. WVSV maintains that, because 10K only requested declaratory relief and attorneys' fees in its 2006 complaint, and did not assert a separate damages claim in the 2006 litigation until 10K lodged a form of judgment providing for reimbursement of the previously paid fees, any restitution award ordering WVSV to repay the fees was improper. We disagree.

¶ 74 Implicit in 10K's request that the court vacate the Galati Judgments was the reversal of the entirety of those judgments, including the attorneys' fees awarded pursuant to them. Restitution of the attorneys' fees 10K paid to WVSV flows directly from vacatur of the judgments that awarded those fees to WVSV. *See generally Moore v. State (In re 1969 Chevrolet, 2–door, I.D. No. 136379K430353, License No. PSH 616)*, 134 Ariz. 357, 360–61, 656 P.2d 646, 649–50 (App. 1982) (citing with approval the Restatement (First) of Restitution § 74 (stating that a person who has conferred a benefit upon another in compliance with a judgment is entitled to restitution if the judgment is reversed or set aside)); *see also Baltimore & Ohio R.R. Co. v. United States*, 279 U.S. 781, 786, 49 S.Ct. 492, 73 L.Ed. 954 (1929) ("The right to recover what one has lost by the enforcement of a judgment subsequently reversed is well established."); Restatement (Third) of Restitution & Unjust Enrichment § 18 (2011) ("A transfer or taking of property, in compliance with or otherwise in consequence of a judgment that is subsequently reversed or avoided, gives the disadvantaged party a claim in restitution as necessary to avoid unjust enrichment."); 5 C.J.S. *Appeal and Error* § 1157 (West 2012) ("The right to have restitution made of money or property which has been taken in the enforcement of a judgment or decree arises on the reversal of the judgment or decree...."). Thus, when the court vacated the Galati Judgments, it necessarily vacated any award of attorneys' fees contained in and flowing from those judgments. We find no error in the court's decision to award restitution to 10K in the amount of the attorneys' fees 10K was previously required to pay WVSV pursuant to the Galati Judgments.

## C. The Award of Attorneys' Fees to 10K

¶ 75 WVSV argues that the trial court erred in relying on A.R.S. § 29–833(A) as a basis to award attorneys' fees to 10K in the 2006 action because that statute should be interpreted as a "fee-sharing" statute that allows a successful plaintiff suing derivatively on behalf of an entity to receive reimbursement by the entity, rather than a "fee-shifting" statute that authorizes an award of attorneys' fees against an opposing party, such as WVSV. 10K counters that, by its language, § 29–833(A) permits the court to award a plaintiff in a derivative action its "reasonable attorney fees" if the derivative action is successful "in whole or in part" or if the plaintiff receives "anything" as a result of a judgment, and nothing in the wording of the statute explicitly limits its application to reimbursement by the entity on whose behalf a plaintiff has successfully filed suit. At the same time, however, nothing in the statute explicitly authorizes a court to order the losing defendant to pay attorneys' fees to a successful plaintiff in a derivative action. Because the language of § 29–833(A) is argu-

in favor of WVSV on 10K's aiding and abetting claim. *See supra* SI 37. Later, Judge Burke reversed his decision to grant judgment as a matter of law in favor of WVSV in the 2003 action in light of Judge Trujillo's rulings in the 2006 action. *See supra* SI 45. On cross-appeal in 1 CA–CV 08–0567, WVSV argues that reversal of the judgment in the 2006 action will reinstate the Galati Judgments and, consequently, require reinstatement of the judgment as a matter of law entered in favor of WVSV in the 2003 action. Our resolution of the previous issues, however, renders moot and therefore answers in the nega-

tive WVSV's claim that judgment as a matter of law should be reinstated in the 2003 action as the result of issue preclusion arising from the Galati Judgments, especially given that 10K was denied a full and fair opportunity to litigate its Eighth Claim for Relief in the 2003 action due to extrinsic fraud. *See Campbell v. SZL Props., Ltd.*, 204 Ariz. 221, 223, ¶ 9, 62 P.3d 966, 968 (App. 2003) (explaining that, for issue preclusion to apply, the parties must have had a full and fair opportunity to litigate the issue in a previous lawsuit). We therefore do not address the parties' other arguments with respect to this issue.

ably susceptible to more than one interpretation, we look beyond the statute's language to construe its meaning and conclude that the trial court erred in awarding attorneys' fees pursuant to that statute.

¶ 76 The parties' dispute over the construction of § 29–833(A) presents a question of law subject to our *de novo* review. *See Forest Guardians v. Wells*, 201 Ariz. 255, 259, ¶ 9, 34 P.3d 364, 368 (2001). Courts in Arizona may award attorneys' fees only when expressly authorized by contract or statute. *Burke v. Ariz. State Ret. Sys.*, 206 Ariz. 269, 272, ¶ 7, 77 P.3d 444, 447 (App.2003).

¶ 77 In construing a statute, we look first to the language of the statute itself as the best evidence of the legislature's intent, and we will ascribe the plain meaning to that language unless the context suggests otherwise. *See Zamora v. Reinstein*, 185 Ariz. 272, 275, 915 P.2d 1227, 1230 (1996); *Brunet v. Murphy*, 212 Ariz. 534, 539, ¶ 20, 135 P.3d 714, 719 (App.2006); *Byers–Watts v. Parker*, 199 Ariz. 466, 469, ¶ 10, 18 P.3d 1265, 1268 (App.2001). "If ambiguity exists, we apply secondary principles of statutory construction and consider other relevant information, including the history, context, and spirit and purpose of the law, to glean legislative intent." *Vicari v. Lake Havasu City*, 222 Ariz. 218, 222, ¶ 13, 213 P.3d 367, 371 (App.2009) (citations omitted). We may also look to legal authority from other states when no Arizona authority is on point. *See State v. Patterson*, 222 Ariz. 574, 580, ¶ 20, 218 P.3d 1031, 1037 (App.2009) (citing *Kotterman v. Killian*, 193 Ariz. 273, 291, 972 P.2d 606, 624 (1999); *Gaethje v. Gaethje*, 7 Ariz.App. 544, 546–47, 441 P.2d 579, 581–82 (1968)).

¶ 78 The statute asserted by 10K as the basis for the award of attorneys' fees, A.R.S. § 29–833(A), provides as follows:

> If a derivative action is successful, in whole or in part, or if anything is received by the plaintiff as a result of a judgment, compromise or settlement of an action or claim, the court may award the plaintiff reasonable expenses, including reasonable attorney fees, and shall direct the plaintiff to remit to the limited liability company the remainder of those proceeds received by him.

¶ 79 Section 29–833 was added to the statutory scheme in 1992, *see* 1992 Ariz. Sess. Laws, ch. 113, § 2 (2nd Reg. Sess.), as part of Arizona's Limited Liability Company Act ("the Act"), which created a new business entity in Arizona, the limited liability company. *See* Michael Polashek, *Limited Liability Company Act*, 26 Ariz. St. L.J. 323, 325–26 (Spring 1994). Our review of the legislative history surrounding the Act provides no clear direction as to the proper interpretation of § 29–833, which has yet to be interpreted by a published decision in this state.

¶ 80 Given the possible ambiguity in A.R.S. § 29–833(A), we look to cases from other states involving similarly worded statutes for assistance in interpretation. The reported cases from other states generally interpret those statutes to hold that where a plaintiff has successfully sued derivatively on behalf of the entity, the court may require the successful entity to help shoulder the burden of the legal expenses incurred by the plaintiff on the entity's behalf. *See Little v. Cooke*, 274 Va. 697, 652 S.E.2d 129, 142–43 (2007) (relying on "the 'common fund' exception to the 'American Rule' prohibiting the shifting of attorneys' fees to the losing party," and recognizing that a plaintiff who receives a common fund for the benefit of others is entitled to attorneys' fees from the fund as a whole (interpreting Va.Code Ann. § 50–73.65 (additional citations omitted))); *see also Glenn v. Hoteltron Sys., Inc.*, 74 N.Y.2d 386, 547 N.Y.S.2d 816, 547 N.E.2d 71, 74–75 (1989) (concluding that attorneys' fees expended on a corporation's behalf should be paid by the corporation and that New York Business Corporation Law § 626(e) "does not authorize the imposition of such expenses on the losing party"); *Jerue v. Millett*, 66 P.3d 736, 740–42 (Alaska 2003) (relying on *Glenn* to state that the purpose of Alaska Statute 10.06.435(j) and Alaska Civil Rule 23.1(j) is fee-sharing and "does not give the corporation itself a claim for fees or provide for an award against individual defendants"). In other words, these cases treat the applicable statutes as fee-sharing statutes, and reject the proposition that such statutes authorize a fee award against the opposing party.

¶ 81 This result is consistent with our opinion in *Steer v. Eggleston,* 202 Ariz. 523, 47 P.3d 1161 (App.2002). In *Steer,* we interpreted A.R.S. § 29–359 (1998), a statute applying to limited partnerships that contains language nearly identical to that found in A.R.S. § 29–833(A), and held as follows:

> Section 29–359 ... allows a limited partner to recoup fees from the limited partnership when the partnership benefits from the limited partner's successful derivative action. A.R.S. § 29–359. The rationale supporting this statute is twofold. First, both the claim and the award belong to the partnership; therefore, burdening the partnership with the expenses is fair and consistent. Edwin W. Hecker, Jr., *Ltd. Partners' Derivative Suits Under The Revised Unif. Ltd. P'ship Act,* 33 Vand. L.Rev. 343, 378 (1980). Second, limited partners with modest shares can bring legitimate claims without risk that their personal stake will be swallowed up by the expense of litigation. *Id.*

We hold that allowing the distribution of fees from the arbitration award in accordance with A.R.S. § 29–359 is consistent with the prohibition of A.R.S. § 12–1510 [ (1994) ]. In fact, such an interpretation gives effect to both statutes. Section 12–1510 continues to prohibit the court or the arbitrator, absent agreement between the parties, from merely adding the responsibility of attorneys' fees to the loser's obligations. Accordingly, the court is barred from simply increasing the overall value of the award. Instead, A.R.S. § 29–359 allows the court to spread the burden of attorneys' fees among all of the partners, consistent with the purpose of a common fund. Appellants are only affected insofar as the other partners are affected; that is, Appellants—along with the other partners—must contribute a pro rata share of the fees to Appellee on behalf of [the limited partnership]. Moreover, the application of A.R.S. § 29–359 does not circumvent A.R.S. § 12–1510 because it does not unnecessarily lengthen or complicate the arbitration process itself. It merely en-

sures that the award is distributed equitably as part of the award approval process. 202 Ariz. at 527, ¶¶ 19–20, 47 P.3d at 1165.

¶ 82 Although in the case before us we are not confronted with a statute such as A.R.S. § 12–1510, we nonetheless conclude that our result is consistent with the reasoning of *Steer.* Spreading the expenses among the members of a limited liability company benefitting from a successful derivative action is appropriate even where non-monetary relief is obtained in such an action. Because A.R.S. § 29–833(A) is most appropriately interpreted as a fee-sharing statute that allows a successful plaintiff suing derivatively on behalf of an entity to be reimbursed by the entity, rather than a fee-shifting statute that authorizes an award of attorneys' fees against an opposing party, the trial court erred in awarding attorneys' fees to 10K pursuant to A.R.S. § 29–833(A).

¶ 83 In sum, with regard to WVSV's appeal in the 2006 litigation, we affirm both the trial court's decision to vacate the Galati Judgments as the product of extrinsic fraud and the court's restitution award to 10K. At the same time, however, we conclude that the court erred in awarding attorneys' fees to 10K pursuant to A.R.S. § 29–833(A).

## II.  Appeal in the 2003 litigation (1 CA–CV 08–0567)

### A.  10K's Appeal & Related Cross–Appeal Issues

¶ 84 10K appeals from the proceedings in the 2003 litigation, including the trial court's judgment granting a new trial after the jury returned a verdict in 10K's favor on its aiding and abetting claim against WVSV and Wolfswinkel, and the court's denial of 10K's motion for a constructive trust to be imposed over the Sun Valley Property. WVSV has filed an answering brief and cross-appeal, arguing that it was entitled to judgment as a matter of law on the aiding and abetting and constructive trust claims, its alternative motion for new trial was properly granted, and its applications for attorneys' fees should have been granted.[36] Finding no error mandating reversal, we affirm.

---

36.  Several of WVSV's arguments in its answer-

ing brief and on cross-appeal are predicated on

### 1. Judge Burke's Grant of a New Trial

¶ 85 As previously noted, on February 11, 2008, Judge Burke vacated the jury's verdict in the 2003 litigation, in part on the basis that the Wolfswinkel convictions and civil judgments had been used improperly. *See supra* ¶ 37. Later, in his February 2009 minute entry affirming his ruling granting a new trial, *see supra* ¶ 45, Judge Burke reasoned as follows:

> The court does not vacate its order for a new trial in this case because it erred in allowing evidence concerning Mr. Wolfswinkel's 14–year old criminal convictions to be presented to the jury, which resulted in more of a trial of Mr. Wolfswinkel's past than the merits of Plaintiffs' claims. In addition, this court presumes that Plaintiffs may now pursue their Eighth Claim for Relief. It appears that it would be appropriate to consolidate CV 2006–011193 with this case for trial or, at a minimum, to allow Plaintiffs to present evidence to the jury regarding how the Galati Judgment was obtained.

¶ 86 10K argues that Judge Burke abused his discretion in granting a new trial in the 2003 action based on the introduction and use of Wolfswinkel's felony convictions and civil judgments at trial. 10K maintains the convictions and civil judgments were admissible as substantive evidence supporting 10K's allegation that Phoenix Holdings breached its fiduciary duty to 10K; the court ignored what actually happened at trial, including that WVSV introduced much of the supposedly violative evidence [37]; the jury was properly instructed as to both the limited purpose for which the evidence was admitted and the impermissible uses of the evidence [38]; the court should have presumed that the jury adhered to its instructions [39]; and given the evidence presented, the court did not err in giving 10K's counsel wide latitude in closing argument,[40] especially given the failure of WVSV and Wolfswinkel to object.[41] 10K

---

this court reversing Judge Trujillo's judgment in the 2006 action. Because we do not reverse that judgment, except with respect to the award of attorneys' fees to 10K pursuant to A.R.S. § 29–833(A), the factual predicate for those arguments does not exist, and we do not further address them, except as necessary.

**37.** Wolfswinkel testified on direct examination about the nature of his convictions; the mitigating circumstances; his sentence of probation, fine, and community service; the criminal court's admiration of his community efforts; and the satisfaction of his sentence.

**38.** The trial court provided the following limiting instruction regarding Wolfswinkel's convictions and civil judgments:

> Evidence has been presented that Conley Wolfswinkel was convicted of felony charges in 1993 and had civil judgments entered against him in 1992 and 1995. This evidence may be considered only as foundation to show that some or all of the members of 10K, LLC, did not want to do business with Mr. Wolfswinkel.
> You may not consider the existence of the convictions and civil judgments as evidence that Conley Wolfswinkel did anything improper in this case. Nor may you consider such evidence as bearing upon Conley Wolfswinkel's credibility as a witness.

The court also instructed the jury that "if evidence was admitted for a limited purpose, you shall consider that evidence only for that limited purpose," and statements made by the lawyers are not evidence.

**39.** *See, e.g., State v. Dann,* 205 Ariz. 557, 571, ¶ 48, 74 P.3d 231, 245 (2003) (stating that courts "allow [] curative instructions and presume that juries follow them").

**40.** *See Ritchie v. Krasner,* 221 Ariz. 288, 303–04, ¶ 54, 211 P.3d 1272, 1287–88 (App.2009) ("Courts give counsel ' "wide latitude" in closing arguments to "comment on the evidence and argue all reasonable inferences" from it.' " (citations omitted)); *accord United States v. Parker,* 549 F.2d 1217, 1222 (9th Cir.1977) (holding that because counsel did not "misstate or exceed the evidence in any significant respect ..., his comments were well within the latitude permitted counsel in their closing arguments" (citing *United States v. Gorostiza,* 468 F.2d 915, 916 (9th Cir.1972))).

**41.** 10K also argues that, by failing to timely object, WVSV and Wolfswinkel waived any argument that 10K violated the trial court's in limine rulings. *See Conant v. Whitney,* 190 Ariz. 290, 293–94, 947 P.2d 864, 867–68 (App.1997) (concluding that an issue first raised in a motion for new trial was waived); *see also Monaco v. HealthPartners of S. Ariz.,* 196 Ariz. 299, 305, ¶ 16, 995 P.2d 735, 741 (App.1999) ("Prompt objection allows the trial court to 'impose restraints upon counsel once it appears that argument is proceeding past legitimate boundaries.' " (quoting *Grant v. Ariz. Pub. Serv. Co.,* 133 Ariz. 434, 453, 652 P.2d 507, 526 (1982))). Waiver, however, "does not apply when it appears 'that the improper conduct of counsel actually influenced the verdict. The trial judge is in the best

concludes the court's ruling should therefore be vacated and the jury verdict reinstated, especially in light of the "abundant" evidence presented by 10K that WVSV and Wolfswinkel aided and abetted Phoenix Holdings' breaches of fiduciary duty.

¶ 87 A trial court may grant a new trial for several reasons, including the following:

A verdict, decision or judgment may be vacated and a new trial granted on motion of the aggrieved party for any of the following causes materially affecting that party's rights:

1. Irregularity in the proceedings of the court, referee, jury or prevailing party, or any order or abuse of discretion, whereby the moving party was deprived of a fair trial.

2. Misconduct of the jury or prevailing party.

. . . .

6. Error in the admission or rejection of evidence, error in the charge to the jury, or in refusing instructions requested, or other errors of law occurring at the trial or during the progress of the action.

. . . .

8. That the verdict, decision, findings of fact, or judgment is not justified by the evidence or is contrary to law.

Ariz. R. Civ. P. 59(a).

■■■■ ¶ 88 We review the trial court's grant of a new trial for an abuse of discretion. *See, e.g., Englert v. Carondelet Health Network,* 199 Ariz. 21, 25, ¶ 5, 13 P.3d 763, 767 (App.2000); *see also Copeland v. Ariz. Veterans Mem'l Coliseum & Expo. Ctr.,* 176 Ariz. 86, 89, 859 P.2d 196, 199 (App.1993) (reviewing a trial court's order under Rule 60(c) for an abuse of discretion). In our review, we "scrutinize with care an order granting a new trial" because "meaningful review in such cases is required to maintain

the integrity of the jury trial system and the practical value of court adjudication." *Zugsmith v. Mullins,* 86 Ariz. 236, 237–38, 344 P.2d 739, 740 (1959) (citations omitted). A trial court may abuse its discretion if the probative force of the evidence demonstrates that the verdict was correct. *State ex rel. Morrison v. McMinn,* 88 Ariz. 261, 262, 355 P.2d 900, 901–02 (1960). Further, "[c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Hutcherson v. City of Phoenix,* 192 Ariz. 51, 56, ¶ 27, 961 P.2d 449, 454 (1998) (quoting *Tennant v. Peoria & Pekin Union Ry. Co.,* 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944)). At the same time, however, we generally afford the trial court wide deference because "[t]he judge sees the witnesses, hears the testimony, and has a special perspective of the relationship between the evidence and the verdict which cannot be recreated by a reviewing court from the printed record." *Id.* at 53, ¶ 12, 961 P.2d at 451 (quoting *Reeves v. Markle,* 119 Ariz. 159, 163, 579 P.2d 1382, 1386 (1978)); *see also Morrison,* 88 Ariz. at 262, 355 P.2d at 901 (stating that the trial court "must of course have wide discretion because of [its] intimate relation to the trial and primary justice").

■■■ ¶ 89 In this case, the trial court's ruling admitting Wolfswinkel's convictions and the civil judgments against him was based on Rule 404(b), Ariz. R. Evid., which in pertinent part provides as follows:

[E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

position to determine this,' " and we will not overturn the court's decision absent an abuse of discretion. *Ritchie,* 221 Ariz. at 303, ¶ 51, 211 P.3d at 1287 (quoting *Anderson Aviation Sales Co. v. Perez,* 19 Ariz.App. 422, 429, 508 P.2d 87, 94 (1973)); *accord Liberatore v. Thompson,* 157 Ariz. 612, 620, 760 P.2d 612, 620 (App.1988) ("[A party] does not forfeit the right to assert [an

opponent's] misconduct as a basis for sustaining the trial court's new trial order if the trial court finds the impropriety sufficient to warrant a new trial despite the absence of a prompt objection." (citations omitted)). We find no abuse of discretion in the trial court's decision to address this issue.

We typically review the trial court's evidentiary rulings for an abuse of discretion. *See, e.g., State v. Ellison,* 213 Ariz. 116, 126, ¶ 25, 140 P.3d 899, 909 (2006).

■ ¶ 90 The trial court did not abuse its discretion in allowing evidence of Wolfswinkel's convictions and civil judgments for limited purposes under Rule 404(b). In general, "litigants are entitled to submit to the triers of fact evidence of events which 'complete the story,' even when such events constitute a crime." *Newman v. Piazza,* 6 Ariz.App. 396, 400, 433 P.2d 47, 51 (1967) (citations omitted). Although WVSV questions the relevancy of the evidence, the parties' positions and the trial court's rulings before and at trial make clear that the evidence was not only relevant, but necessary, to 10K's claim. In this case, 10K was required to prove at trial that Phoenix Holdings had breached a fiduciary duty to 10K. The evidence of Wolfswinkel's convictions and civil judgments (and their consequences, such as Wolfswinkel's inability to hold assets in his name or serve as an officer in WVSV) was relevant for the purpose of developing 10K's argument that one of the critical ways Phoenix Holdings breached its fiduciary duty to 10K was by facilitating the sale of Breycliffe's interest in the 2002 Breycliffe Agreement to WVSV and Wolfswinkel, in direct violation of 10K's instructions, and to explain the basis for and reasonableness of those instructions and demonstrate the magnitude of Phoenix Holdings' alleged breach of fiduciary duty.[42] *See generally Elia v. Pifer,* 194 Ariz. 74, 79, ¶ 18, 977 P.2d 796, 801 (App.1998) ("[A] party will not be allowed to complain of the introduction of irrelevant evidence where he has asserted a position that makes such evidence relevant." (citation omitted)). We find no abuse of discretion in the trial court's decision to admit evidence of Wolfswinkel's convictions and civil judgments pursuant to Rule 404(b).[43]

■ ¶ 91 At the same time, we also conclude that the trial court did not abuse its discretion in vacating the jury's verdict and ordering a new trial based on Rule 59(a), Ariz. R. Civ. P. 10K suggests that the court based its ruling solely on a brief portion of the closing argument of 10K's counsel, and argues that much of the evidence relied on by counsel for that argument came from testimony elicited from Wolfswinkel by his own counsel on direct examination—testimony that was elicited in violation of the court's in limine ruling and over 10K's objection. When viewed in their entirety, however, Judge Burke's rulings appear to be predicated on a combination of WVSV's actions, 10K's actions, and a lack of court control over those actions. Judge Burke acknowledged that he should have sought to better control presentation of the testimony with regard to Wolfswinkel, and that presentation of the evidence and 10K's argument based on that evidence caused the trial to be more about Wolfswinkel's past and his alleged proclivity

42. The relevance of this evidence is further underscored by the fact that the jury was specifically instructed that "[a]n agent must obey all *reasonable* directions given by the principal in regard to the manner of carrying out its fiduciary duties." (Emphasis added.) *See* Ariz. R. Evid. 401 (providing that evidence is relevant if it has any tendency to make a fact that is of consequence in determining an action more or less probable than it would be without the evidence). Also, despite WVSV's argument to the contrary, the evidence provided necessary context to the 10K members' stated concerns that a Wolfswinkel-related entity might file bankruptcy, and was relevant to address possible misconceptions about Wolfswinkel's past and the 10K members' motives.

43. In a footnote in its opening brief, 10K argues that the trial court erred in failing to also admit evidence of Wolfswinkel's convictions pursuant to Rule 609, Ariz. R. Evid. Subject to limitations, Rule 609 allows evidence that a witness has been convicted of a crime to be admitted for impeachment purposes. *See* Ariz. R. Evid. 609(a)-(d). Evidence of a conviction under Rule 609 is not admissible, however, if more than ten years has passed since the witness's conviction or release from confinement for that conviction, whichever is later, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. Ariz. R. Evid. 609(b). In this case, Wolfswinkel's convictions were more than ten years old at the time of trial and no confinement had been imposed for his convictions. Even assuming *arguendo* that 10K has not waived this argument by failing to fully present and develop it on appeal, *see AMERCO v. Shoen,* 184 Ariz. 150, 154 n. 4, 907 P.2d 536, 540 n. 4 (App.1995), we find no abuse of the court's discretion in declining to admit evidence of Wolfswinkel's convictions pursuant to Rule 609.

for corruption (as proof of his character in order to show action in conformity therewith) than the aiding and abetting allegations against WVSV and Wolfswinkel.[44] In its closing argument, 10K properly emphasized the reasons that its members did not want to do business with Wolfswinkel and had instructed Burns and Phoenix Holdings not to approach him, but its argument lends support to the conclusion that 10K was also urging the jury to punish Wolfswinkel because he had somehow escaped proper punishment for his previous misdeeds:

> We listened to this man say things like, you know, I didn't have the conveniences of Charles Keating to write my own appeal because he was in jail and I wasn't. You know, the prosecutor wanted to put me away for 18 years, I got probation. I'm proud. You know, I had a billion dollar judgment against the tax payers [sic] of these United States, I bought it for $1,350,000. What kind of a moral compass is that? The kind of moral compass that takes a breach of fiduciary duty and another and another and another to good people, good people, members of our society and runs with it for over a year after being told repeatedly, you can have your money back, go home with everything you came with plus interest.
>
> . . . .
>
> And that's why you have punitive damages . . . . Why do people behave this way? Is it sport? Is it just a good time? Well, I'm going to offer an answer, and it[']s why our great democracy is governed by jurors, because Conley Wolfswinkel and W.V.S.V. think they can. There are no consequences in his history. Prosecutor, 18 years, I get probation, billion dollar judgment. I buy it for $1,350,000.
>
> . . . .
>
> Well, our members testified they didn't want to do business with him because of nine felony convictions. We've got 2 billion-dollar judgments that didn't get his attention. That makes 11. He ought to

be right in the middle of his learning curve.

¶ 92 Judge Burke had the unique opportunity to hear the testimony and argument, observe its effect on the jury, and determine through his observations that the trial had been unfairly compromised; in contrast, we have only a cold record, which does not convey voice emphasis or inflection, or allow us to observe the jury and its reactions. *See, e.g., Hutcherson,* 192 Ariz. at 53, ¶ 12, 961 P.2d at 451 (recognizing the "special perspective" of the trial judge); *Ritchie,* 221 Ariz. at 303, ¶ 52, 211 P.3d at 1287 (stating that the trial judge is in the best position to determine whether misconduct has materially affected the rights of the aggrieved party (citations omitted)). In this case, Judge Burke found that 10K's closing argument had materially affected WVSV's rights, most specifically with respect to 10K's punitive damages claim, and we cannot say that finding is unsupported by the record, especially given the misuse of the evidence, which was admitted for a limited purpose. The fact that limiting instructions were given does not change our analysis because a trial court is not obligated to ignore what it has witnessed at trial, and although we presume juries follow the court's instructions, we have here a situation in which the court itself observed that, in all likelihood, the improper use of the convictions and judgments infected and compromised the jury's ability to follow the limiting instructions. Whether we might have granted a new trial on this record is not our standard of review, and we conclude that the trial court did not abuse its discretion in finding that unfair prejudice resulted and ordering a new trial. *See generally State v. Schurz,* 176 Ariz. 46, 52, 859 P.2d 156, 162 (1993) (recognizing that unfair prejudice "means an undue tendency to suggest decision on an improper basis," such as emotion (citing Fed.R.Evid. 403 advisory committee's note)).

¶ 93 We also reject 10K's argument that any possible error in the admission and use of Wolfswinkel's convictions and civil judg-

---

44. In fact, Judge Burke commented on the third day of trial about the prominence the evidence of Wolfswinkel's past had been given when he not-

ed his concern that the scope of his ruling might have been exceeded because "all the jury's heard about for the past two days is the conviction."

ments and the events surrounding them was necessarily harmless because "overwhelming" evidence supported the jury's verdict that WVSV and Wolfswinkel aided and abetted Phoenix Holdings' breach of fiduciary duty and that 10K was entitled to punitive damages. *See generally Brown v. U.S. Fid. & Guar. Co.*, 194 Ariz. 85, 88, ¶ 7, 977 P.2d 807, 810 (App.1998) ("The improper admission of evidence is not reversible error if the jury would have reached the same verdict without the evidence." (citations omitted)).

¶ 94 Even assuming *arguendo* that 10K did not waive this argument, we cannot say that the evidence is so overwhelming as to render any error harmless. Although the weight of the evidence proffered by 10K in support of its harmless error argument might favor 10K's position on the merits of the lawsuit when taken as a whole, and that evidence might also support finding WVSV had acted with the requisite intent to support a substantial punitive damages award, *see Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 330–31, 723 P.2d 675, 679–80 (1986), much of the evidence relied on by 10K for its argument depends on the context in which the evidence is viewed, and we cannot say that it is so overwhelming as to require finding any error harmless.

### 2. WVSV's Cross–Appeal Seeking JMOL

¶ 95 WVSV argues that it was entitled to judgment as a matter of law on 10K's aiding and abetting claim in the 2003 litigation. In effect, WVSV maintains that Judge Burke was correct in vacating the jury's verdict in the 2003 litigation and granting WVSV's motion for judgment as a matter of law, *see supra* ¶ 37, but erred in revising his ruling and setting aside the judgment in light of Judge Trujillo's rulings. *See supra* ¶ 45. We disagree with each of WVSV's arguments.[45]

### a. Substantial Assistance as a Predicate

¶ 96 WVSV argues that Judge Burke abused his discretion in setting aside the judgment as a matter of law in favor of WVSV because WVSV's act of closing escrow in 2003 could not give "substantial assistance" to a breach of fiduciary duty that was "complete" in 2002, when Phoenix Holdings entered 10K into the 2002 Breycliffe Agreement.[46] WVSV's argument fails because it improperly characterizes 10K's claim.

¶ 97 In the 2003 action, 10K's claim against WVSV and Wolfswinkel was for aiding and abetting a breach of fiduciary duty committed by the Phoenix Holdings defendants. Such a claim requires proof of the following elements: (1) the primary tortfeasor must commit a tort causing injury to the plaintiff; (2) the defendant must know the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in achieving the breach. *Wells Fargo Bank*, 201 Ariz. at 485, ¶ 34, 38 P.3d at 23 (citations omitted).

¶ 98 WVSV argues that the only claim for which 10K sought recovery "was the injury arising from one specific tort— namely, that Phoenix Holdings wrongfully subjected 10K to the 2002 Breycliffe Agreement and Mangum Judgment," and that the aiding and abetting claim against WVSV "depended entirely on connecting WVSV to the wrongdoing giving rise to the 2002 Breycliffe Agreement." WVSV argues that it did not participate in the formation of the 2002 Breycliffe Agreement

---

45. We have previously rejected WVSV's argument that it was entitled to judgment as a matter of law because it acted in justified reliance on the Galati Judgments before the judgment setting them aside, *see supra* ¶ 71 n. 34, as well as WVSV's argument that judgment as a matter of law should be reinstated upon reversal of the judgment in the 2006 action as a result of issue preclusion. *See supra* ¶ 72 n. 35.

46. In making its argument, WVSV points us to a demonstrative exhibit utilized in 10K's closing argument that "framed" 10K's theory as follows:

Despite awareness that Phoenix Holdings breached its fiduciary duty to 10K by entering 10K into the 2002 Breycliffe Agreement without authority (no consent or opinion letter), and ignoring 10K's offer to repay Wolfswinkel its investment, with interest, W.V.S.V. and Wolfswinkel encouraged or substantially assisted Phoenix Holdings' breach of fiduciary duty by closing on July 16, 2003, thereby depriving 10K of its property.

(Emphasis omitted.)

and "had nothing to do with the incorporation of that agreement into the 2002 Mangum Judgment," both of which were entered before Hickey approached Wolfswinkel about the Sun Valley Property, and that 10K had already suffered appreciable and ascertainable damages as a result of the 2002 Breycliffe Agreement and 2002 Mangum Judgment before WVSV became involved. Accordingly, WVSV contends it did not substantially assist or encourage Phoenix Holdings in the achievement of its breach because "the existence of an actionable claim against Phoenix Holdings for 10K's entry into the 2002 Breycliffe Agreement did not require close of escrow."

¶ 99 WVSV's argument contorts the actual aiding and abetting claim asserted by 10K because it insists that all harm was completed upon entry of the 2002 Breycliffe Agreement and 2002 Mangum Judgment, before WVSV became involved, and that the only wrongdoing alleged against WVSV was closing the transaction. The record indicates that 10K consistently asserted that Phoenix Holdings had engaged in a calculated course of conduct in which it committed a series of breaches, including entering the 2002 Breycliffe Agreement and stipulating to the 2002 Mangum Judgment, designed to enrich itself and others at 10K's expense. Further, 10K sought to hold WVSV liable for allegedly engaging in a continuum of conduct, which included closing escrow, that enabled Phoenix Holdings to complete its scheme and fully perfect the harm, including taking the Sun Valley Property, thereby turning Phoenix Holdings' initial breaches into a far more significant injury.

¶ 100 As 10K notes, it presented evidence through which it sought to show that although Phoenix Holdings allegedly breached its fiduciary duty by entering 10K into the 2002 Breycliffe Agreement, Breycliffe did not

have the funds to close the transaction and consummate the agreement, and without a buyer (in this case, WVSV) to complete the agreement, Phoenix Holdings could not have perfected the harm caused by its breach.[47] Based on this and other evidence presented by 10K, a jury could properly find that WVSV substantially assisted Phoenix Holdings in the achievement of its breach and reject WVSV's argument that it was absolved by the fact that the Galati Judgments had been issued before the close of escrow.

¶ 101 Further, we find no basis for WVSV's contention that once a breach results in any harm, the tort is per se complete, and therefore substantial assistance provided after a breach has begun but before it has concluded cannot give rise to liability, even though further and greater harm occurs after the assistance is provided. *See generally In re Am. Cont'l Corp./Lincoln Sav. & Loan Secs. Litig.*, 794 F.Supp. 1424, 1434–35 (D.Ariz.1992) ("Proof of substantial assistance requires a showing that the defendant's assistance was a substantial factor in causing the plaintiff's harm." (citation omitted)). Although WVSV may have had no involvement in initiating the alleged scheme to defraud 10K and acquire the Sun Valley Property, a jury could find that WVSV thereafter substantially assisted the overall achievement of the alleged breach for its own benefit. *See generally Wells Fargo Bank*, 201 Ariz. at 489, ¶ 54, 38 P.3d at 27.[48]

### b. 10K's Pretrial Disclosure

¶ 102 WVSV also argues that, regardless of the Galati Judgments, it was entitled to judgment as a matter of law because the theory of the aiding and abetting claim 10K presented at trial had not been the subject of meaningful pretrial disclosure. WVSV argues that 10K failed to properly disclose its theory that WVSV's closing of the escrow

---

**47.** In fact, as WVSV acknowledges in its answering brief, "One of the primary claims that 10K asserted against its manager, Phoenix Holdings, was that Phoenix Holdings had breached its fiduciary duty by disregarding specific instructions from the 10K members not to allow any Wolfswinkel-related entity to acquire an interest in the property at issue in this litigation."

**48.** Also, as with WVSV's reliance claim, we cannot ignore the intertwined relationships of the parties. Given that WVSV's own member and assignor, Breycliffe, actively participated with Phoenix Holdings in perpetrating the extrinsic fraud committed on 10K, the record does not support the conclusion that WVSV is entitled to judgment as a matter of law based on a lack of substantial assistance.

was conduct by which WVSV had substantially assisted Phoenix Holdings' breach of fiduciary duty. Under Rule 26.1(a)(2), Ariz. R. Civ. P., parties must disclose to one another "[t]he legal theory upon which each claim or defense is based." A party who fails to comply with a disclosure order may be subject to sanctions, including dismissal of the action. *See* Ariz. R. Civ. P. 37(b)(2)(C).

¶ 103 Even assuming *arguendo* that WVSV has not waived its non-disclosure argument,[49] we find no merit to the argument. The foundation of the argument is belied by the record and the positions taken by the parties before and during trial. 10K's amended complaint and its August 2005 Third Supplemental Disclosure Statement indicate that it alleged a series of breaches by Phoenix Holdings, with the culmination of the overall breach assisted by WVSV when WVSV "negotiated a side deal" with terms favorable to Phoenix Holdings and "continued to finance and close the transaction." Moreover, WVSV fails to identify any actual prejudice that it suffered from the alleged lack of disclosure. *See Gerow v. Covill*, 192 Ariz. 9, 18, ¶ 43, 960 P.2d 55, 64 (App.1998) (affirming the denial of sanctions for an alleged late disclosure of a legal theory because the opposing party "had adequate notice and time to prepare"). We find no basis for any sanction, much less dismissal of 10K's claim.

### 3. 10K's Request for a Constructive Trust

¶ 104 As we have noted, in August 2007, Judge Burke denied 10K's motion for partial summary judgment as to the imposition of a constructive trust over the Sun Valley Property and granted WVSV's cross-motion barring the imposition of such a trust. *See supra* ¶ 31. Later, after Judge Trujillo issued his rulings setting aside the Galati Judgments, Judge Burke vacated his decision to grant WVSV's cross-motion and denied

WVSV's motion, but also affirmed the denial of 10K's motion. *See supra* ¶ 46. In his March 23, 2009 minute entry, Judge Burke explained his reasoning as follows:

Although the present effect of Judge Trujillo's ruling is to reinstate Plaintiff's Eighth Claim for Relief in the action before him, there is no certainty as to the ultimate outcome of that case and the financial landscape involving the parties changed dramatically due to the payment of millions of dollars by WVSV to or on behalf of Plaintiff. This distinguishes this case from *New York Life Ins. Co. v. Nashville Trust Co.* [200 Tenn. 513], 292 S.W.2d 749 (Tenn.1956) and *Norman v. Transamerica Title Insurance Company*, 108 Ariz. 301 [101], 493 P.2d 112 (1972) because in those cases the defendants did not pay any consideration for the property upon which a constructive trust is sought.

The payments toward the purchase price made by WVSV tip the balance of the equities in favor of WVSV with regard to the question of whether a constructive trust should be imposed.

¶ 105 10K argues that Judge Burke erred in denying its request for a constructive trust.[50] 10K maintains that Phoenix Holdings breached its fiduciary duties to 10K by entering the 2002 Breycliffe Agreement (and thereby stipulating to the 2002 Mangum Judgment) and arranging the Breycliffe/WVSV Agreement, and that sufficient facts indicate WVSV had knowledge of the breach before it entered the Breycliffe/WVSV Agreement and took control of the Sun Valley Property. 10K further maintains that its right to a constructive trust should not be dependent on whether 10K ultimately invalidates the 2002 Breycliffe Agreement through the Eighth Claim for Relief, and Judge Burke erred by linking his

---

49. In its opening brief on cross-appeal, WVSV has failed to cite legal authority for its contention that it is entitled to judgment as a matter of law for an alleged disclosure violation. Thus, WVSV has arguably waived this contention. *See* ARCAP 13(a)(6) (requiring that the opening brief "contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on").

50. Although the denial of a motion for summary judgment is not usually an appealable order or reviewable on appeal from a final judgment, we may review such an order when the denial is based strictly on a point of law. *Hauskins v. McGillicuddy*, 175 Ariz. 42, 49, 852 P.2d 1226, 1233 (App.1992).

decision to the "unrelated issues" of a final resolution of that claim and a "premature" balancing of the equities relating to expenditures by WVSV.

¶ 106 The decision whether to fashion an equitable remedy lies within the trial court's discretion, and we will not disturb the court's decision absent an abuse of that discretion. *Loiselle v. Cosas Mgmt. Grp., L.L.C.*, 224 Ariz. 207, 210, ¶ 8, 228 P.3d 943, 946 (App.2010). To soundly exercise its discretion, however, the trial court must correctly apply the law. *Marco C. v. Sean C.*, 218 Ariz. 216, 218, ¶ 4, 181 P.3d 1137, 1139 (App.2008). We review *de novo* the trial court's application of the law and its decision whether to grant summary judgment. *Loiselle*, 224 Ariz. at 210, ¶ 8, 228 P.3d at 946 (citing *Andrews*, 205 Ariz. at 240, ¶ 12, 69 P.3d at 11). The availability of equitable relief and defenses is also subject to our *de novo* review. *Id.* Summary judgment is appropriate only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Orme Sch.*, 166 Ariz. at 309, 802 P.2d at 1008; Ariz. R. Civ. P. 56(c)(1).

¶ 107 A court may impose a constructive trust when title to property has been obtained through actual fraud, misrepresentation, concealment, undue influence, duress, or similar means, or if there has been a breach of fiduciary duty. *Turley v. Ethington*, 213 Ariz. 640, 643, ¶ 9, 146 P.3d 1282, 1285 (App.2006) (citing *Harmon v. Harmon*, 126 Ariz. 242, 244, 613 P.2d 1298, 1300 (App.1980); *French v. French*, 125 Ariz. 12, 15, 606 P.2d 830, 833 (App.1980)). A constructive trust is a flexible, equitable remedy that a court may shape and impose in a variety of circumstances, especially situations where conscience demands. *See Raestle v. Whitson*, 119 Ariz. 524, 526, 582 P.2d 170, 172 (1978). It is a remedial device, used "to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs." *Harmon*, 126 Ariz. at 244, 613 P.2d at 1300. A constructive trust arises by operation of law rather than agreement and will be imposed when circumstances resulting, or likely to result, in unjust enrichment make it inequitable that the

property should be retained by the one who holds the legal title. *See Burch & Cracchiolo, P.A. v. Pugliani*, 144 Ariz. 281, 285, 697 P.2d 674, 678 (1985); *Golleher v. Horton*, 148 Ariz. 537, 544, 715 P.2d 1225, 1232 (App. 1985).

¶ 108 In Arizona, the proof necessary to establish entitlement to a constructive trust is clear and convincing evidence. *Harmon*, 126 Ariz. at 244, 613 P.2d at 1300. We will not interfere with the trial court's determination as to the sufficiency of the evidence unless it can be said that, as a matter of law, no reasonable person could have agreed with it. *See L.M. White Contracting Co. v. Tucson Rock & Sand Co.*, 11 Ariz.App. 540, 545, 466 P.2d 413, 418 (1970) (citing *Murillo v. Hernandez*, 79 Ariz. 1, 9, 281 P.2d 786, 791 (1955)). Because imposition of a constructive trust is an equitable remedy, no set or unyielding formula exists for a court to impose one. *Turley*, 213 Ariz. at 643, ¶ 9, 146 P.3d at 1285 (citing *Chirekos v. Chirekos*, 24 Ariz.App. 223, 224, 537 P.2d 608, 609 (1975)).

¶ 109 We find no abuse of discretion in the trial court's conclusion that the equities in this case are not so clear at this time as to permit summary judgment regarding the issue of 10K's entitlement to the imposition of a constructive trust over the Sun Valley Property. Although 10K describes the court's consideration of WVSV's investment of millions of dollars in the Sun Valley Property as being "inappropriate" and "misplaced," given the equitable nature of the remedy sought by 10K, we find no error in the court's consideration and balancing of the equities relating to expenditures by WVSV. Even assuming *arguendo* that 10K meets the legal criteria for such a trust, there is no automatic right to an equitable remedy, and 10K has not explained in its briefs or at oral argument how the imposition of a constructive trust is essential to protect its asserted interest in the Sun Valley Property. Our resolution of this issue on appeal, however, does not preclude the trial court from reconsidering the issue as the case progresses on

remand. We make no comment as to the merits of the issue on remand.[51]

### B. Remaining Issues on Cross–Appeal/Attorneys' Fees

¶ 110 WVSV maintains that its applications for attorneys' fees should have been granted on the bases that (1) 10K's post-trial motion to disqualify Judge Burke violated Rule 11, Ariz. R. Civ. P., and (2) the aiding and abetting claim brought by 10K against WVSV was brought without reasonable cause, thereby justifying an award of attorneys' fees to WVSV pursuant to A.R.S. § 29–833(B). We find no merit to either argument.

#### 1. 10K's Motion for Disqualification

¶ 111 WVSV argues that the trial court erred in denying WVSV's request for sanctions on the basis that 10K violated Rule 11(a), Ariz. R. Civ. P., when 10K filed a post-trial motion to disqualify Judge Burke for cause based on an alleged appearance of bias and prejudice. *See* Ariz. R. Civ. P. 42(f)(2) (providing for change of judge for cause); A.R.S. § 12–409(B)(5) (providing that one ground for requesting a change of judge for cause is if "the party filing the affidavit has cause to believe and does believe that on account of the bias, prejudice, or interest of the judge he cannot obtain a fair and impartial trial"). We disagree.

¶ 112 In part, Rule 11(a) requires a trial court to impose "an appropriate sanction" against a party who files a motion that violates the following rule:

> The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by exist-

ing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

¶ 113 In general, an attorney violates Rule 11 by filing a document that he or she knows or should know asserts a position that "is insubstantial, frivolous, groundless or otherwise unjustified." *James, Cooke & Hobson, Inc. v. Lake Havasu Plumbing & Fire Prot.*, 177 Ariz. 316, 319, 868 P.2d 329, 332 (App.1993) (citing *Boone v. Superior Court*, 145 Ariz. 235, 241, 700 P.2d 1335, 1341 (1985)). In assessing whether to impose sanctions, a court evaluates the conduct under an objective reasonableness standard. *Id.* at 319–20, 868 P.2d at 332–33 (citations omitted). We review the trial court's determination of a motion for sanctions for an abuse of discretion. *Id.* at 320, 868 P.2d at 333.

¶ 114 The issue evolves out of the following facts: A few days before trial in the 2003 action, 10K requested that Judge Burke voluntarily recuse himself based primarily on "a historic and current relationship between [Judge Burke] and Charles Keith, [Sr.]," a long-time close friend and business associate of the Wolfswinkel family who had attended both sessions of the pretrial management conference, during which numerous evidentiary and procedural issues had been decided. 10K contended that Keith had also appeared as part of the Wolfswinkel contingent at a joint mediation session in Maui, and an appearance of impropriety had been created when Keith appeared before Judge Burke at the pretrial management conference because Keith had been attorney Burke's client before Judge Burke's appointment to the bench, and Judge Burke had neglected to

---

**51.** In its answering brief/cross-appeal, WVSV contends that, not only did Judge Burke not err in denying 10K's request for a constructive trust, but WVSV was entitled to judgment as a matter of law on its cross-motion for summary judgment on that claim, and Judge Burke therefore abused his discretion in setting aside the initial grant of summary judgment for WVSV. WVSV argues that even if the Galati Judgments were properly vacated for fraud, WVSV cannot be deemed a constructive trustee when it acquired the Sun Valley Property in reliance on the then-existing Galati Judgments. Because we have rejected WVSV's reliance claim, we find no abuse of discretion in the court's decision to vacate summary judgment for WVSV as to the imposition of a constructive trust. Further, because in this opinion we do not reverse the judgment in the 2006 action, WVSV's argument that reversal of that judgment will require reinstatement of the judgment in favor of WVSV on the constructive trust claim is moot.

resign as statutory agent for the business entity connected to Keith after his appointment.[52] Judge Burke declined to recuse himself, stating that he did not know Keith and citing an inadvertent error in his failure to resign as statutory agent for the business entity allegedly connected to Keith.

¶ 115 Meanwhile, 10K filed a formal motion for a change of judge for cause pursuant to Rule 42(f)(2), Ariz. R. Civ. P. The matter was transferred to then-Presiding Civil Judge Mark F. Aceto. *See* Ariz. R. Civ. P. 42(f)(2)(D). After reviewing the pleadings and presiding over a hearing regarding the motion, Judge Aceto found no allegation or evidence of actual bias or sufficient facts to create an appearance of impropriety, and he denied the motion. Judge Burke then presided over the trial in the 2003 action.

¶ 116 After Judge Burke issued his February 11, 2008 minute entry granting WVSV's renewed motion for judgment as a matter of law, 10K again moved to disqualify Judge Burke for cause, arguing that in vacating the jury's verdict, Judge Burke had not been impartial or, at a minimum, his impartiality might reasonably be questioned. In making its argument, 10K cited several alleged misstatements, comments, and rulings of the court, as well as other facts and inferences 10K argued supported its motion. In addition to filing a response, WVSV and Wolfswinkel moved for Rule 11 sanctions, including their reasonable attorneys' fees incurred in opposing the motion.

¶ 117 The matter was assigned to Judge Aceto, who considered the parties' pleadings and conducted an evidentiary hearing. After taking the matter under advisement, Judge Aceto issued a detailed and thoughtful minute entry, in which he addressed each of 10K's arguments, acknowledged "[i]t is quite common for a party who has not prevailed to feel that the judge acted out of bias and/or prejudice," and then denied 10K's motion,

finding that 10K had not met the objective standard necessary for a change of judge for cause.[53] He also denied the motion for sanctions.

¶ 118 On appeal, WVSV fails to demonstrate that Judge Aceto abused his discretion, either in making his findings related to the parties' motions or in denying the motion for sanctions. Although he denied 10K's motion for a change of judge for cause after concluding it did not meet the necessary threshold, Judge Aceto did not find that 10K's motion was so "insubstantial, frivolous, groundless or otherwise unjustified" as to meet the standard for Rule 11 sanctions, and given the record before us, we cannot conclude that 10K's motion failed to meet an objective reasonableness standard such that sanctions were warranted. Judge Aceto also did not find that 10K's motion was made for an improper purpose, such as to harass WVSV and Wolfswinkel, or to cause unnecessary delay or needless increase in the cost of the litigation, and we find nothing to conclude that the absence of such findings was an abuse of discretion.

### 2. Attorneys' Fees Under A.R.S. § 29–833(B)

¶ 119 WVSV next argues that 10K's claim of aiding and abetting was brought without reasonable cause, and therefore WVSV should have been awarded attorneys' fees pursuant to A.R.S. § 29–833(B). We disagree.

¶ 120 Subsection (B) of A.R.S. § 29–833 states as follows:

In an action instituted in the right of any domestic or foreign limited liability company by a member or members, the court having jurisdiction on final judgment and a finding that the action was brought without reasonable cause may require the plaintiff or plaintiffs to pay to the parties

---

**52.** In response, WVSV filed affidavits from Keith and his son, in which they stated that it was Keith's son, not Keith, who held an interest in the business entity.

**53.** Judge Aceto also noted as follows:

When highlighted as they have been here by a skilled writer zealously seeking relief for his

clients, the reported comments and behavior of Judge Burke at and around trial sound less than ideal. However, in the context of contentious trials, such as the trial in this case, lively exchanges between the court and counsel are common.

named as defendants the reasonable expenses, including attorney fees, incurred by them in the defense of such action.

¶ 121 WVSV's argument is based primarily on its assertion that we should reinstate the trial court's previous rulings rendering WVSV the prevailing party and then determine that 10K lacked reasonable cause to have filed the aiding and abetting claim against WVSV.[54] However, with the minor exception of the award of attorneys' fees pursuant to A.R.S. § 29-833, we have affirmed Judge Trujillo's rulings in the 2006 action, and have declined to reinstate Judge Burke's February 11, 2008 ruling granting judgment as a matter of law in favor of WVSV. WVSV's potential liability in this action continues to exist, and we cannot say at this time that the merits of 10K's claim as a whole are not objectively reasonable, such that the claim was brought without reasonable cause. *See Biggs v. Vail*, 119 Wash.2d 129, 830 P.2d 350, 353-54 (1992); *see also Austin B. v. Escondido Union Sch. Dist.*, 149 Cal.App.4th 860, 57 Cal.Rptr.3d 454, 476 (2007) ("'Reasonable cause' is an objective standard which asks whether any reasonable attorney would have thought the claim tenable." (citation omitted)).

## III. Costs and Attorneys' Fees on Appeal

¶ 122 Both sides request an award of costs and attorneys' fees on appeal. We deny each side's request as to both costs and attorneys' fees. Neither party has prevailed entirely, *see Watson Constr. Co. v. Amfac Mortgage Corp.*, 124 Ariz. 570, 584-85, 606 P.2d 421, 435-36 (App.1979), and in light of our opinion, this case is not over. Moreover, we find no basis for an award of attorneys' fees to WVSV under A.R.S. § 29-833(B), we have rejected A.R.S. § 29-833(A) as a basis for awarding attorneys' fees to 10K in this action, and Rule 21, ARCAP, merely sets forth the procedure for requesting attorneys' fees

and may not be cited as a substantive basis for an award of fees. *Freeman v. Sorchych*, 226 Ariz. 242, 252-53, ¶ 31, 245 P.3d 927, 937-38 (App.2011) (citations omitted).

## CONCLUSION

¶ 123 For the aforementioned reasons, we affirm the trial court's judgments, except with respect to the award of attorneys' fees to 10K in the 2006 action pursuant to A.R.S. § 29-833(A), and we remand for further proceedings consistent with this opinion.

CONCURRING: PATRICIA K. NORRIS, Judge, and PATRICK IRVINE, Judge.[*]

---

54. The argument also relies in part on the success of WVSV's prior argument that 10K failed to provide meaningful pretrial disclosure, an argument that we have rejected.

* Judge Patrick Irvine was a sitting member of this court when the matter was assigned to this panel of the court. He retired effective December 31, 2011. In accordance with the authority granted

by Article 6, Section 3, of the Arizona Constitution and pursuant to A.R.S. § 12-145, the Chief Justice of the Arizona Supreme Court has designated Judge Irvine as a judge pro tempore in the Court of Appeals, Division One, for the purpose of participating in the resolution of cases assigned to this panel during his term in office.